STATE of Missouri ex rel., MISSOURI
HIGHWAY AND TRANSPORTATION
COMMISSION, Appellant,

v.

MARYVILLE LAND PARTNERSHIP,
et al., Respondent.

No. ED 77864.

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 16, 2001.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 6, 2001.

Application for Transfer Denied
Jan. 22, 2002.

Mayer S. Klein, John E. Toma, Jr., Newman, Freyman, Klein & Gamache, P.C., St. Louis, MO, for cross-defendant/appellant.

Michael A. Vitale, Tammy S. King, Herzog, Crebs & McGhee, LLP, St. Louis, MO, for cross-defendants/respondent Maryville Land Partnership.

JAMES R. DOWD, Judge.

The Missouri Highway and Transportation Commission (MHTC), Lindbergh–Warson Properties, Inc. (Lindbergh–Warson) and Maryville Land Partnership (Maryville Land) made competing claims for funds held by U.S. Title Guaranty Company, Inc. in an escrow account. U.S. Title interpleaded the funds into court on December 11, 1997 and following a two-day bench trial, the court entered judgment awarding the escrowed funds to Lindbergh Warson and Maryville Land. MHTC appeals. We affirm.

We view the evidence in the light most favorable to the judgment. In the late 1970s and early 1980's the MHTC developed plans to improve Highway 40 between Ballas Road and Highway 141 in St. Louis County because of serious traffic problems in the area. At the same time, Lindbergh–Warson and Maryville Land were in the early stages of planning Maryville Centre, a 100–acre office and commercial development on property purchased from Maryville College. Tee Baur, president of Lindbergh–Warson and a partner in Maryville Land, contacted Frank Kriz, MHTC's District Engineer charged with supervising the design, construction and maintenance of all state-owned road facilities in the City and County of St. Louis. Baur requested that MHTC build an interchange that would provide direct access into Maryville Centre. At that time, no state or federal funds were allocated for Highway 40 improvements and MHTC did not believe they would receive government funds because of a long history of neighborhood opposition to further development of High-

way 40. Kriz also advised Baur that MHTC must conclude the project serves a public purpose before public funds can be allocated for it. Baur said that if MHTC went forward with plans for the project, he would work for a positive public response. Kriz agreed. To move the project along, Baur agreed to have Lindbergh–Warson provide an irrevocable letter of credit upon which MHTC could draw upon as needed to pay for construction of the overpass and other improvements. Baur then hired a consultant and created the Highway 40 Improvement Committee to work with neighbors to make the plan acceptable to the local community so that MHTC might conclude that the project served a public purpose, which would in turn make it eligible to receive federal funds as well as state matching funds.

On August 3, 1984, MHTC and Lindbergh–Warson entered into a Construction Agreement to build the overpass and certain other improvements. The agreement between the parties, in relevant part, states:

This Agreement, made and entered into by and between the State of Missouri, acting by and through the Missouri Highway and Transportation Commission, hereinafter called "Commission", and "Lindbergh–Warson Properties, Incorporated d/b/a Baur Properties", [sic.] a Missouri Corporation, herein after called "Company"

The Commission owns and maintains as part of the State Highway Transportation System Route 40 in St. Louis County. The Company [Lindbergh–Warson] has requested the Commission to construct a Grade Separation over Route 40 approximately midway between the Route 141 and the Mason Road interchanges. The Commission does not presently have sufficient funds available to complete the desired improvements. The Company has expressed a willingness to participate in the funding of such improvements under the terms and conditions set out herein.

In consideration of the mutual covenants contained herein to be faithfully kept and performed by the parties hereto, their legal representatives, successors, and assigns, it is agreed as follows:

1. Company is desirous of Commission's constructing a bridge over Route 40 and relocating the North Outer Roadway.

2. Commission agrees to design and cause its contractor to construct a bridge over Route 40 and relocate the existing North Outer Roadway as required by construction procedures.

3. Company agrees to reimburse Commission for the actual construction cost of the Grade Separation and the North Outer Roadway. The Company's participation in the construction of the North Outer Roadway and the Grade Separation shall not exceed $1,000,000.00. The Company also agrees to furnish or reimburse Commission for the right-of-way necessary to reconstruct the North Outer Roadway. The Company shall deposit with the Commission within 60 days after the execution of the agreement, an irrevocable letter of credit that the Commission can draw on as construction progresses.

On October 31, 1985 Lindbergh Warson, Maryville Land, the Commission, Community Title Company (now "U.S. Title") and Centerre Bank entered into an escrow agreement to replace the original letter of credit with an escrow account funded by Maryville Land. Because Lindbergh–Warson had agreed to pay an additional $90,000 for certain culvert work and MHTC had already obtained reimbursements against the letter of credit in the amount of $55,440, Maryville Land deposit-

ed $1,034,560 into an escrow account held by U.S. Title. The Escrow Agreement permitted the Commission to draw on the escrowed funds as needed during the construction of the overpass to pay the contractor. It also provided that Maryville Land would retain title to any accrued interest in the account.

Shortly after the Construction Agreement was executed and without the knowledge of Lindbergh–Warson or Maryville Land, MHTC applied for and received federal funds and approved state matching funds to pay for the improvements on Highway 40, including most of the work included in the Construction Agreement between Lindbergh–Warson and MHTC. MHTC designated the majority of work to be performed under the Construction Agreement as project numbers MAF–F–40–5(58) and MAF–F–40–5(60). In the summaries of estimated cost prepared for these projects MHTC indicates that they are to be paid for by state and federal funds, not funding from others.

The improvements under project numbers MAF–F–40–5(58) and MAF–F–40–5(60) were ultimately constructed in 1985 and 1986 under contracts with Fred Weber, Inc., and were funded by approximately 70% federal and 30% state funds. MHTC never made a request for the escrowed funds during the entire construction process and neither party requested that the funds be paid out to them for the ten years that followed. But under the terms of the Escrow Agreement, Maryville Land continued to receive the interest from the escrowed funds and retained the right to direct the escrow holder how the funds were to be invested. Evidence was presented that over those ten years the interchange benefited not merely the Maryville Center, but all of the developments along Highway 40 between Mason Road and Highway 141, including Maryville University, Kellwood, the Jewish Community Center, Fairfield Condominiums and Pinetree Lake.

In April 1997, Maryville Land informed MHTC that they were making demand that the escrowed funds be returned to them. MHTC then requested that the escrowed funds be paid to MHTC. This suit followed.

The trial court cites to several undisputed facts in support of its conclusion that the intent of the parties was that if state and federal funds were received for the interchange the balance of the escrowed funds would be returned to Lindbergh–Warson and Maryville Land. First, a recital in the preamble to the Construction Agreement, sometimes called a "whereas clause," states that MHTC "does not *presently* have sufficient funds available to complete the desired improvements." (emphasis added). Second, Baur invested considerable time and money garnering public support for the improvements to Highway 40; that this was done with the knowledge and concurrence of MHTC; and that partly as a result of these efforts the project received both public and governmental approval. Third, MHTC determined that the overpass would serve a public purpose, approved the use of state matching funds for the project, and applied for and received federal funding. Finally, rather than use the escrowed funds to pay for the improvements, MHTC paid for construction of the overpass with federal and state funds. On the basis of these findings the court held that MHTC was not entitled to the escrowed funds and that they should be returned to Maryville Land.

MHTC raises several points on appeal. In its first and third points MHTC argues that the trial court violated the parol evidence rule when it looked to the Construction Agreement and other parol evidence to interpret the Escrow Agreement be-

cause the Escrow Agreement is a complete and unambiguous contract that requires the escrow holder to release the escrowed funds to MHTC.

■ The parol evidence rule has been described as "a deceptive maze rather than a workable rule." *Jake C. Byers, Inc. v. J.B.C. Investments*, 834 S.W.2d 806, 812 (Mo.App. E.D.1992). There is a general consensus that when the parties have reduced their final and complete agreement to writing, the parol evidence rule does not permit the writing to be varied or contradicted and this principle is a substantive rule of law and not a rule of evidence. *Id.* (citing *Commerce Trust Co. v. Watts*, 360 Mo. 971, 231 S.W.2d 817, 820 (1950)); RESTATEMENT (SECOND) CONTRACTS § 213. The parol evidence rule does not prevent relevant parol evidence from being admitted; but prohibits the trier of fact from using that evidence to vary, alter or contradict the terms of a binding, unambiguous and integrated written contract. RESTATEMENT (SECOND) CONTRACTS § 214. The essence of the parol evidence rule is, therefore, that evidence outside a completely integrated contract cannot be used to change the agreement.

■ The parol evidence rule does not, however, prohibit the presentation of parol evidence to determine *if* the contract is integrated. All authorities agree that the court must determine if the contract is integrated before it applies the parol evidence rule. *Wulfing v. Kansas City Southern Industries, Inc.*, 842 S.W.2d 133, 146 (Mo.App. W.D.1992); RESTATEMENT (SECOND) CONTRACTS § 209. A written agreement is integrated if it represents a final expression of one or more terms of the agreement. RESTATEMENT (SECOND) CONTRACTS § 209(1). Contracts can be either completely or partially integrated. If a written contract is a completely integrated agreement even consistent additional terms within its scope are precluded. *Centerre Bank of Kansas City v. Distributors*, 705 S.W.2d 42, 51 (Mo.App. W.D. 1985); RESTATEMENT (SECOND) CONTRACTS § 209 (cmt.a). If, however, the writing omits a consistent additional term that is either agreed to for separate consideration or might naturally have been omitted in the circumstances, the agreement is considered only partially integrated and collateral facts and circumstances may be introduced to prove consistent additional terms. *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316, 324 (Mo. banc 1979); RESTATEMENT (SECOND) CONTRACTS § 216(2).

Scholars disagree, however, on the method by which courts should determine if the contract is integrated. *Compare* 4 WILLISTON, CONTRACTS § 633 (3rd ed.1961) and 1 RESTATEMENT, CONTRACTS, §§ 237, 240, with 3 CORBIN, CONTRACTS § 582 (1960), RESTATEMENT (SECOND) CONTRACTS § 209 and UCC 2–202; *see generally*, FARNSWORTH, CONTRACTS § 7.3. Williston's position is that "the contract must appear on its face to be incomplete in order to permit parol evidence of additional terms." 4 WILLISTON, CONTRACTS § 633. If the contract appears on its face to be completely integrated, the court should simply accept that this is so, without looking to the surrounding circumstances. *Id.* The modern trend has been to reject this view on the ground that a "writing cannot prove its own completeness and accuracy." CORBIN, *The Parol Evidence Rule*, 53 YALE L.J. 603, 630 (1944). Corbin, the Second Restatement, and the UCC have all taken the position that the court should take into consideration all relevant circumstances before determining that the contract is integrated. 3 CORBIN, CONTRACTS § 582; RESTATEMENT (SECOND) CONTRACTS § 209 (cmt.b); UCC 2–202 Cmt. 1.

The Missouri Supreme Court has not spoken to the question; but the language

used in its decisions has led this court to adopt the position advocated by Williston and the First Restatement. *Jake C. Byers, Inc.*, 834 S.W.2d at 811–12. So, the initial inquiry is to determine if the Escrow Agreement here is completely or partially integrated on its face. Under present Missouri law, if it is a complete agreement on its face, it is conclusively presumed to be a final as well as a complete agreement between the parties. *Id.* at 812. We look to the Escrow Agreement and find the following relevant provisions:

THIS ESCROW AGREEMENT, made and entered into as of this 31st day of October, 1985 by and between Lindbergh–Warson Properties, Inc. ("Lindbergh"), and Maryville Land Partnership, a Joint Venture ("Maryville"), the Missouri Highway and Transportation Commission ("Commission"), Community Title Company ("Community") and Centerre Bank, National Association ("Bank").

WHEREAS, Lindbergh and the Commission heretofore entered into a certain Agreement . . . wherein Lindbergh agreed to pay a sum not exceeding One Million and no/100 Dollars ($1,000,-000.00) in reimbursement of the Commission for the actual construction cost of the Grade Separation and the North Outer Roadway on Highway 40 in St. Louis County, Missouri, approximately midway between Route 141 and the Mason Road interchange; and

WHEREAS, Lindbergh and the Commission heretofore entered into a supplemental agreement wherein Lindbergh agreed to pay an additional sum of Ninety Thousand and no/100 ($90,-000.00) for certain "culvert work"; and

WHEREAS, Maryville, of which Lindbergh is a general partner, has heretofore succeeded to the rights and obligations of Lindbergh in the Agreement; and

WHEREAS, Bank has heretofore loaned to Maryville the monies necessary to fund Maryville's obligations to the Commission under the Agreement and in connection therewith Bank agreed to advance the proceeds of said loan at the request of, and at the direction of, the Commission upon receipt from the Commission of its certification that (a) the cost of the overpass and culvert work completed to date, as a percentage of the total projected cost of said work, is not less than the amount previously disbursed plus the amount of the requested advance, expressed as a percentage of Maryville's total obligation to Commission and (b) all previous advances have been used to satisfy Maryville's obligation to partially defray the costs of the culvert and overpass work (the "Certification") and

WHEREAS, Bank would like to be relieved of its direct obligation to the Commission in this regard and the parties hereto are mutually agreed that Community shall serve as the Escrow Agent pursuant to the terms hereinafter specified. . . .

NOW, THEREFORE, in consideration of the promises and of the mutual covenants and agreements hereinafter set forth, and of other good and valuable consideration, the parties hereto covenant and agree as follows:

1. *Escrowed Funds.* Maryville shall, upon execution of the Escrow Agreement, cause to be deposited with Community the sum of One Million Thirty Four Thousand Five Hundred Sitxty and no/100 Dollars ($1,034,560.00), being the balance of Maryville's obligation to Commission (the "Escrowed Funds"), to secure

the obligations of Maryville under the Agreement. . . .

2. *Investment.* The Escrowed Funds shall be invested in Certificates of deposit with Bank in such amounts and with such maturity dates as Maryville shall direct.

3. *Escrow Funds.* The Escrowed Funds shall be advanced as directed by Commission within five (5) business days of receipt of the written request of the Commission. Each such request shall be accompanied by a Certification in the form annexed hereto as Exhibit B. . . .

\* \* \* \* \* \*

5. *Accumulation of Income.* All income accumulated from the investment of the Escrowed Funds and not used to satisfy interest or other loan charges, if any, shall be the property of Maryville and shall be paid to Maryville, from time to time, upon request.

■ The Escrow Agreement simply makes no reference to what would happen to any unused funds in the escrow account, but recitals in the Escrow Agreement reference both the Construction Agreement and a supplemental agreement. These references show that the fundamental purpose of the Escrow Agreement was to facilitate the Construction Agreement by replacing Lindbergh–Warson's letter of credit with an escrow account furnished by Maryville Land, who had succeeded to Lindbergh Warson's interests. The face of the Escrow Agreement itself makes clear that a number of documents, read together, make up the entire agreement between the Commission, Lindbergh–Warson and Maryville Land. The Escrow Agreement merely supplements terms in the underlying Construction Agreement and does not represent the entire agreement of the parties. Importantly, it does not provide for the possibility that the parties would succeed in obtaining state and federal funds for the construction of the overpass. We therefore conclude that the Escrow Agreement was not a completely integrated agreement and collateral facts and circumstances could be introduced to show consistent additional terms. *See Craig v. Jo B. Gardner, Inc.,* 586 S.W.2d 316, 324 (Mo.1979). The court did not err in allowing evidence to show that the parties agreement assumed that Maryville Land would be entitled to a return of the escrowed funds if MHTC obtained state and federal funding. MHTC's first and third points of error therefore fail.

MHTC's second, fourth, fifth, sixth and seventh points of error address the trial court's interpretation of the Construction Agreement. MHTC maintains that the Construction Agreement unambiguously provides that MHTC was the only party that could receive the funds Lindbergh–Warson contributed for the overpass construction and the court erred in relying on parol evidence to interpret it. MHTC argues that the trial court erred in using the recitals of the Construction Agreement to find an ambiguity in the contract because recitals are not strictly part of the contract. MHTC then argues that even if the court looks to the recitals, there is still no ambiguity and that the plain language of the Construction Agreement requires the escrowed funds be given to MHTC.

■ "The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Butler v. Mitchell–Hugeback, Inc.,* 895 S.W.2d 15, 21 (Mo. banc 1995). We use the plain, ordinary, and usual meaning of the contract's words and consider the document as a whole. *Preferred Physicians Mut. Management Group, Inc. v. Preferred Physicians Mut.*

*Risk Retention Group, Inc.,* 961 S.W.2d 100, 103 (Mo.App. W.D.1998). Each term and clause is construed to avoid an effect that renders other terms and provisions meaningless. *Ringstreet Northcrest, Inc. v. Bisanz,* 890 S.W.2d 713, 718 (Mo.App. W.D.1995). A construction attributing a reasonable meaning to each phrase and clause, and harmonizing all provisions of the agreement is preferred to one that leaves some of the provisions without function or sense. *Id.*

■ Written contracts often, as here, begin with a series of recitals or "whereas" clauses describing the surrounding circumstances and the objectives of the parties. Although their proper role in the interpretation of the main body of the contract has sometimes been unclear, it is plain that they are frequently intended to, and often do, shed light on the circumstances the parties wished to have considered in the interpretation of the contract. *See* Farnsworth, Contracts § 7.10 at 513 (2nd ed.1990). Recognizing this, the New York Court of Appeals explained their role in contract interpretation as follows:

> The promise is what the parties agreed to do, and hence is the operative part of the instrument, while the recital states what led up to the promise and gives the inducement for making it. When the explanation of the reason for the promise is at variance with the promise itself, the latter, if clear and unambiguous, must prevail, as it is the transaction between the parties. The rule governing the subject is well stated in a late English case as follows: "If the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each oth-

er, the operative part is to be preferred."

*Williams v. Barkley,* 165 N.Y. 48, 58 N.E. 765, 767 (1900) (quoting *Ex parte Dawes,* 17 Q.B.D. 275, 286 (1886)). Thus, while recitals are not strictly a part of the contract because they do not impose contractual duties on the parties, Missouri courts look to them to find the intent of the parties when the operative language is ambiguous, uncertain or indefinite. *Albrecht v. State Highway Commission,* 363 S.W.2d 643, 646 (Mo.1962); *see also Irwin's Bank v. Fletcher,* 195 Ind. 669, 145 N.E. 869, 877 (1924).

The Construction Agreement here leaves uncertain what the obligations of the parties would be if MHTC obtained state and federal funding for the overpass. The trial court therefore properly looked to the recitals to see if they shed light on the intention of the parties. *Albrecht,* 363 S.W.2d at 646. MHTC, who drafted the agreement, clearly alludes to the possibility that it would obtain government funding for the project in the recitals. It says: "The Commission does not *presently* have sufficient funds available to complete the desired improvements." (emphasis added). The meaning of this recital is not clear on its face, but the fact that MHTC says that it "does not presently have sufficient funds" strongly suggests that it might have those funds in the future. Because the cardinal principle of contract interpretation is to ascertain the intention of the parties (*Butler,* 895 S.W.2d at 21) and neither the operative language nor the recital clearly provided for what would happen if MHTC obtained government funding, the trial court properly considered parol evidence to resolve the uncertainty.

The trial court, after hearing all the evidence and observing the demeanor of the witnesses, concluded Lindbergh–Warson's underlying reason for participating in

funding the overpass was to enable planning and construction to proceed until a decision had been made about whether state and federal funds would be available for the project. This conclusion coupled with other evidence favorable to the verdict compels an inference that the parties intended that if Baur was successful in garnering public support for the project, MHTC would conclude that the project served a public purpose, government funds would became available and Lindbergh Warson would not have to pay for the overpass. This conclusion is bolstered by the conduct of the parties both before and after the Construction Agreement was signed.

When the interpretation of a contract depends on the credibility of witnesses, our review is confined to determining whether there is substantial evidence in the record to support the judgment. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The evidence favorable to the judgment shows MHTC not only knew but encouraged Baur to invest time and money to develop public and governmental support for the funding of the Highway 40 improvements. Shortly after Lindbergh–Warson and MHTC entered into the Construction Agreement, MHTC applied for and received federal funding and approved state matching funds for the overpass. Then, MHTC paid for the overpass construction from the federal and state monies, not the escrowed funds. Finally, MHTC did not attempt to obtain the escrowed funds for ten years after the construction was completed and then only when it was informed that Maryville Land was seeking a release of the funds. The recitals in the Escrow Agreement and the testimonial evidence provide admissible and substantial support for the conclusion that the parties entered into the contract with the intent that Lindbergh–Warson would be released from its obligation to pay for the overpass if MHTC received federal and state funds for the project. When Maryville Land assumed Lindbergh Warson's responsibilities in the Escrow Agreement it also became entitled to the benefits of the Construction Agreement. MHTC's second, fourth, fifth, sixth and seventh points are therefore denied.

■ In its final point, MHTC argues that simple equity requires that it receive the escrowed funds because MHTC completed the Maryville Land improvements, Lindbergh–Warson and Maryville Land received a material benefit from this and the state road fund has been deprived of the money in the escrow account. The standard of review for a court-tried case requires us to affirm the judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy*, 536 S.W.2d at 32. There is substantial evidence in this record to support the trial court's finding that the state road fund was fully compensated for the Maryville Land improvements from federal and state monies and that the intent of the parties was that if this should happen Maryville Land would be entitled to a return of the escrowed funds. The court did not misapply or erroneously declare the law and so the judgment is AFFIRMED.

CLIFFORD H. AHRENS, P.J., and WILLIAM H. CRANDALL, JR., J., Concur.