

# In the Missouri Court of Appeals
## Western District

JENNIFER A. HANNA, )
Appellant, )
v. )  **WD76868 Consolidated with**
)  **WD76951**
MICHAEL A. HANNA, )
Respondent. )  FILED: November 4, 2014

## APPEAL FROM THE CIRCUIT COURT OF JOHNSON COUNTY
### THE HONORABLE WILLIAM B. COLLINS, JUDGE

### BEFORE DIVISION ONE: THOMAS H. NEWTON, PRESIDING JUDGE,
### LISA WHITE HARDWICK AND ANTHONY R. GABBERT, JUDGES

Jennifer Hanna ("Wife") appeals from the circuit court's judgment dissolving her marriage to Michael Hanna ("Husband"). She raises ten points on appeal. In Points I through VII, she challenges the court's interpretation of the parties' prenuptial agreement and its classification of property pursuant to that agreement. She appeals the court's denial of her request for maintenance in Point VIII and the denial of her request to restore her maiden name in Point IX. Lastly, in Point X, she challenges the court's entry of an amended judgment after it lost its authority to do so.

Wife's Points IX and X are meritorious, and Point IX requires a modification of the judgment. Her remaining points lack merit, however, and a formal, published discussion addressing those points would serve no jurisprudential purpose. Accordingly, we affirm the circuit court's judgment as to Points I through VIII by summary order pursuant to

Rule 84.16(b). A memorandum explaining the reasons for our decision on those points has been provided to the parties. This opinion addresses only Wife's Points IX and X.

FACTUAL AND PROCEDURAL HISTORY

The facts necessary to the disposition of Points IX and X are that Husband and Wife were married on December 5, 1997. Wife filed her petition for dissolution of marriage in November 2010. In her petition, Wife asked the court to divide their property equitably, award her maintenance and attorney's fees, and restore her maiden name to her. Husband filed an amended answer and counter-petition.

Trial was held on Wife's petition and Husband's counter-petition in February and March 2013. The court entered its judgment in May 2013. In the judgment, the court divided and classified the parties' property pursuant to the parties' prenuptial agreement and denied Wife's claims for maintenance and attorney's fees.

Wife filed a motion to amend the judgment or, in the alternative, for a new trial. Ninety-one days after Wife filed her motion to amend, the court entered an amended judgment. Wife filed notices of appeal as to both the original judgment and the amended judgment. We consolidated the appeals.

## ANALYSIS

### Validity of Amended Judgment

The first point we will address is Wife's Point X, as it concerns which judgment is properly before us on appeal. In this point, Wife contends the circuit court erred in entering an amended judgment because it was without jurisdiction to do so. She argues

2

that, because the amended judgment was a nullity, the judgment that we should review is the court's original judgment.

The court entered its original judgment on May 14, 2013. Wife filed a motion to amend the judgment on June 13, 2013. Ninety-one days later, on September 11, 2013, the court entered its amended judgment.

A motion to amend, if filed within thirty days after judgment is entered, is an authorized after-trial motion that extends the circuit court's control over its judgment for up to 90 days from the date the motion was filed. Rules 78.04 and 81.05(a)(2)(A); *Medlin v. RLC, Inc.*, 423 S.W.3d 276, 283 (Mo. App. 2014). If the court fails to rule on the motion to amend within the 90-day period, the motion is deemed overruled by operation of law. Rules 78.06 and 81.05(a)(2)(A). The judgment becomes final for purpose of appeal on the ninetieth day, at which time the court is divested of jurisdiction and loses its authority over the judgment. *See Spicer v. Donald N. Spicer Revocable Living Trust*, 336 S.W.3d 466, 469 (Mo. banc 2011). An amended judgment entered after the expiration of the 90-day period is a nullity. *Adkins v. Hontz*, 337 S.W.3d 711, 716 n.3 (Mo. App. 2011).

Husband contends that the 90-day time limit of Rule 78.06 does not apply in this case because the court's original judgment was not a final judgment. In *Gipson v. Fox*, 248 S.W.3d 641, 643-44 (Mo. App. 2008), the court ruled that the time limits of Rule 78.06 did not apply because there was no final judgment, given that the court failed to address all of the issues and left issues pending. Here, Husband argues that the original judgment was not final because it did not address Wife's request to restore her maiden name. Relying on *Alliett & Williams v. Tri-City Constr. Co.*, 694 S.W.2d 287,

3

288 (Mo. App. 1985), Husband asserts that the court's silence in the original judgment on Wife's request to restore her maiden name cannot be interpreted as a disposition of that issue; therefore, the issue remained pending following the court's entry of its original judgment.

The court's original judgment was not silent on Wife's request to restore her maiden name. While it did not specifically refer to Wife's claim in her petition to restore her maiden name, the original judgment provided, "All other claims for relief not specifically granted are denied." Wife's request to restore her maiden name was a claim that was not specifically granted. Thus, pursuant to this provision, it was denied. The original judgment disposed of all of the issues in the case and was a final judgment.

Because the amended judgment was entered after the expiration of the 90-day period, it was a nullity.[1] The only valid judgment was the May 14, 2013 original judgment. This is the judgment we will review. Point X is granted.

### *Restoration of Maiden Name*

In Point IX, Wife contends the court erred in denying her request to restore her maiden name. We agree. Where there is no evidence that the name change would be detrimental to anyone, the circuit court's denial of a restoration of maiden name request

---

[1] Husband asserts that, even if we find, as we have, that the original judgment was a final judgment, the court could properly amend it under Rule 74.06(a). Rule 74.06(a) allows the court to correct clerical mistakes in judgments "arising from oversight or omission" at any time. "An order *nunc pro tunc* merely causes 'the record to conform to the true judicial determination of the parties' rights' by correcting a clerical error." *Johnson v. Brown*, 154 S.W.3d 448, 452 (Mo. App. 2005) (quoting *Pirtle v. Cook*, 956 S.W.2d 235, 243 (Mo. banc 1997)). "'Clerical errors do not include judicial errors,'" however, and Rule 74.06(a) "'may not be used to enter a judgment different from that judgment actually made[,] even if the judgment made was not the judgment intended.'" *Id.* (citation omitted). While the court stated in the hearing on Wife's motion to amend that its failure to grant her request to restore her maiden name was an oversight, the amended judgment, which granted her request, entered a judgment that was different from the original judgment, which had denied her request. Moreover, the amended judgment added new findings of fact on several other issues. Because the amended judgment attempted to correct judicial errors, not clerical errors, Rule 74.06(a) provided no authority for its entry.

4

is error.  *Neal v. Neal*, 941 S.W.2d 501, 503 (Mo. banc 1997); *King v. King*, 66 S.W.3d 28, 40 (Mo. App. 2001).  Point IX is granted.  The portion of the judgment denying Wife's request to restore her maiden name is reversed.  We need not remand this matter to the circuit court, as Rule 84.14 affords us discretion to "give such judgment as the court ought to give."  Therefore, the judgment is modified to restore Wife's maiden name of Hinton to her.

### CONCLUSION

The judgment, as modified, is affirmed.  A memorandum explaining our reasons for denying the points not covered by this opinion has been provided to the parties pursuant to Rule 84.16(b).

_____
**LISA WHITE HARDWICK, JUDGE**

**ALL CONCUR.**

5



# In the Missouri Court of Appeals
## Western District

JENNIFER A. HANNA,               )
                    **Appellant,**  )
                           )
v.                           )       **WD76868 Consolidated with**
                           )       **WD76951**
MICHAEL A. HANNA,          )
                 **Respondent.**  )       Fɪʟᴇᴅ:

### MEMORANDUM SUPPLEMENTING OPINION
### AFFIRMING JUDGMENT PURSUANT TO RULE 84.16(b)

This memorandum is for the information of the parties and sets forth the reasons for affirming the judgment.

> **THIS STATEMENT DOES NOT CONSTITUTE A FORMAL OPINION OF THIS COURT. IT IS NOT UNIFORMLY AVAILABLE. IT SHALL NOT BE REPORTED, CITED OR OTHERWISE USED IN UNRELATED CASES BEFORE THIS COURT OR ANY OTHER COURT. IN THE EVENT OF THE FILING OF A MOTION TO REHEAR OR TRANSFER TO THE SUPREME COURT, A COPY OF THIS MEMORANDUM SHALL BE ATTACHED TO ANY SUCH MOTION.**

Jennifer Hanna ("Wife") appeals from the circuit court's judgment dissolving her marriage to Michael Hanna ("Husband"). She raises ten points on appeal. In Points I through VII, she challenges the court's interpretation of the parties' prenuptial agreement and its classification of property pursuant to that agreement. She appeals the court's denial of her request for maintenance in Point VIII and the denial of her request to restore her maiden name in Point IX. Lastly, in Point X, she challenges the court's entering an amended judgment after it lost its authority to do so.

Wife's Points IX and X are meritorious, and Point IX requires a modification of the judgment. We have addressed Points IX and X in a published opinion handed down simultaneously with this memorandum. For reasons explained herein, we find that Wife's remaining points lack merit. Accordingly, we affirm the circuit court's judgment as to Points I through VIII.

## FACTUAL AND PROCEDURAL HISTORY

Husband and Wife were married on December 5, 1997. At the time, Husband was employed as a dentist, and Wife was a network engineer for Sprint. Both Husband and Wife had been married before, and each had a child from their previous marriages.

Before they married, Husband directed his attorney to draft a prenuptial agreement. Wife had her attorney review the prenuptial agreement, and the parties signed the agreement on their wedding day. The prenuptial agreement contained exhibits listing specific assets that each party owned at the time of the marriage, and it stated that those assets would remain separate property. The parties agreed that "each party shall become possessed of additional property, both real and personal in the future which each party hereto shall separately own or have an interest in each said party's own individual right." Additionally, the parties stated that it was their desire to "fix and determine the rights of each of them in any and all property" that they owned or had an interest in at the time of the marriage "or may acquire thereafter." With regard to income from property, the agreement provided that "all income accrued by the parties from earning, interest and proceeds of all property not otherwise designated as separate in this Agreement shall be marital property."

2

The parties added four amendments to their prenuptial agreement over the next several years. The 1999 amendment contained a provision stating that each party would be solely responsible for all expenses incurred from assets held individually or in trust for the benefit of that individual. The 1999 amendment also modified the classification of certain assets listed in the exhibits attached to the prenuptial agreement. In the 2001 and two 2002 amendments, the parties memorialized transactions between them involving lots that were part of one of the parcels of property listed in the exhibits attached to the prenuptial agreement.

In 1999, Husband and Wife established separate trusts in their individual names. They transferred the real property listed as Husband's separate property in the exhibits attached to the prenuptial agreement into Husband's trust via warranty deeds, in which Wife stated that she was "signing solely to release any marital rights which she may have in the property." In 2009, Husband and Wife established a joint trust. They transferred the marital residence, a duplex, and an apartment complex, all of which were acquired during the marriage, into their joint trust.

During the marriage, Husband acquired an interest in several additional rental properties and Wife acquired an interest in rental property. Husband and Wife titled these properties in the names of their individual trusts and used rental income from the properties to pay the mortgages on the properties.

Wife filed her petition for dissolution of marriage in November 2010. In her petition, Wife asked the court to divide their property equitably, award her maintenance and attorney's fees, and restore her maiden name to her. Husband filed an amended answer and counter-petition, in which he asserted that the parties' prenuptial

3

agreement, including its amendments, governed the division of property and denied that Wife was entitled to maintenance or attorney's fees. Husband also sought a declaration that the prenuptial agreement was valid.

After a trial on Husband's declaratory judgment count, the court entered an interlocutory order in August 2012 finding that the prenuptial agreement was valid and would govern the court's disposition of property. In December 2012, the court granted Wife's request for temporary maintenance and ordered Husband to pay Wife $2000 per month.

Trial on the remaining issues was held in February and March 2013. The court entered its judgment in May 2013. In the judgment, the court found that, consistent with its interlocutory order, the prenuptial agreement was legally valid, enforceable, and neither procedurally nor substantively unconscionable. The court determined that the agreement contained a "future property clause" that fixed and determined the property rights that each party would have to property acquired during the marriage and held in their sole names. The court found that, during the marriage, each party acquired real property in the name of their individual trusts that they intended to hold as separate property. The court further found that the agreement designated the income from this separate property to be separate property.

Thus, pursuant to the prenuptial agreement, the court determined that Husband's net equity in his separate property was valued at $2,586,358, while Wife's net equity in her separate property was valued at $204,500. The court set aside marital property worth $775,196 to Husband and $891,897 to Wife, and the court ordered Husband to pay Wife an additional $20,000 in cash. The court denied Wife's claims for

4

maintenance and attorney's fees. The court also denied "[a]ll other claims for relief not specifically granted."

Wife filed a motion to amend the judgment or, in the alternative, for a new trial. Ninety-one days after Wife filed her motion to amend, the court entered an amended judgment. Wife filed notices of appeal as to both the original judgment and the amended judgment. We consolidated the appeals. As we have explained in the published opinion, the only valid judgment was the court's original judgment, entered in May 2013. Therefore, that is the judgment that we will review.

### STANDARD OF REVIEW

Appellate review of a dissolution judgment is under the standard of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Jenkins v. Jenkins*, 368 S.W.3d 363, 366 (Mo. App. 2012). We will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 366-67. We view the evidence and any reasonable inferences therefrom in the light most favorable to the court's decision and disregard all contrary evidence and inferences. *Id.* at 367. We will affirm the judgment if the result was "correct on any tenable basis." *Miller v. Miller*, 309 S.W.3d 428, 429 (Mo. App. 2010).

Several of Wife's points allege error in the court's classification of the parties' property. The circuit court has broad discretion to classify property in a dissolution action. *Torrey v. Torrey*, 333 S.W.3d 34, 36 (Mo. App. 2010). We will not disturb the court's decision absent an abuse of discretion. *Id.* Likewise, the circuit court has broad discretion to award or deny maintenance, and we review its decision only for an abuse

5

of discretion. *Sparks v. Sparks*, 417 S.W.3d 269, 295 (Mo. App. 2013). "'An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to indicate indifference and a lack of careful judicial consideration.'" *Torrey,* 333 S.W.3d at 36 (citation omitted). "If reasonable persons can differ about the propriety of the circuit court's action, it cannot be said that the court abused its discretion." *Id.*

## ANALYSIS

For relational purposes, we will address some of Wife's points out of order.

### *Interpretation of Prenuptial Agreement*

In Point I, Wife alleges error in the court's interpretation of the parties' prenuptial agreement regarding the classification of property acquired during the marriage. Wife's allegations of error are based upon her belief that the court interpreted the prenuptial agreement as providing that property acquired during the marriage without the use of separate funds was that party's separate property solely by virtue of being titled in that party's name. Wife is mistaken, however, as both the judgment and the evidence indicate that the court interpreted the prenuptial agreement as providing only that property acquired during the marriage *with separate funds* and titled solely in one party's name, plus any income from that property held as separate property and not commingled with marital funds, was that party's separate property.

In general, property acquired during marriage, including income earned on separate property, is presumed to be marital property. § 452.330.3, RSMo 2000[2]; *Short v. Short*, 356 S.W.3d 235, 242 (Mo. App. 2011). This presumption may be overcome by presenting clear and convincing evidence that the property is non-marital because it

---

[2] All statutory references are to the Revised Statutes of Missouri 2000.

6

falls into one of the exceptions listed in Section 452.330.2. *In re Marriage of Fishe*r, 258

S.W.3d 852, 857 (Mo. App. 2008). Section 452.330.2 provides that property is non-

marital if it is:

> (1) Property acquired by gift, bequest, devise, or descent;
>
> (2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent;
>
> (3) Property acquired by a spouse after a decree of legal separation;
>
> (4) Property excluded by valid written agreement of the parties; and
>
> (5) The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions.

The court determined that the property that Husband acquired during the marriage fell

under subsection four, because the court interpreted the prenuptial agreement as

excluding this property from the parties' marital property.

As with any contract, the cardinal rule in interpreting a prenuptial agreement is to

determine the parties' intent and give effect to that intent. *Short*, 356 S.W.3d at 243.

We look to the plain language of the agreement to determine the parties' intent. *See*

*TAP Pharm. Prods. Inc. v. State Bd. of Pharmacy*, 238 S.W.3d 140, 143 (Mo. banc

2007).

With regard to separate property, Husband and Wife's prenuptial agreement

provided, in pertinent part:

> IN CONSIDERATION OF the contemplated marriage of the above-named parties and for other good and valuable consideration, the receipt of which is hereby acknowledged by each of the parties hereto, it is agreed and stipulated as follows:

7

. . . .

2.      Each party hereto is possessed of property to which the opposite party played no role in the accumulation thereof, and further, each party shall become possessed of additional property, both real and personal in the future which each party hereto shall separately own or have an interest in each said party's own individual right.

. . . .

4.      In anticipation of their marriage, the parties desire to fix and determine the rights of each of them in any and all property of every nature and description and wheresoever located that the other of them, may own or have an interest in at the time of such marriage, or may acquire thereafter.

. . . .

5.  Each of the parties mutually desires to retain, manage or dispose separately by gift, will or otherwise, all of his or her estate to the same extent as if each of the parties remained single.

In consideration of mutual convenants contained herein, prospective husband and prospective wife agree as follows:

(a)      Each of the parties shall retain the title, management and control of the estate now owned by each of them, whether real, personal or mixed, and all increases or additions thereto, entirely free and unmolested by the other party and may encumber, sell, dispose, give or provide by Will or otherwise, for the disposition of any or all of such estates so separately owned and possessed.  A list of all said property is attached and set forth in "EXHIBIT A-1/A-2" and EXHIBIT B-1/B-2" attached hereto.

. . . .

(h)      The parties hereto acknowledge that all income accrued by the parties from earnings, interest and proceeds of all property not otherwise designated as separate in this Agreement shall be marital property.

The plain language of these provisions indicates that, as to property that the parties

owned at the time of the marriage, the parties intended to keep as separate all of the

property that was listed as separate property on the exhibits attached to the agreement.

Further, the parties recognized that each of them would acquire separate property

8

during the marriage that they would hold solely in their own names, and they agreed that they would keep this after-acquired property separate. Lastly, the agreement indicates that the parties intended that income from property that the agreement designated as separate would be separate property, as it states that all income from property *not* designated as separate would be marital property. We find that the circuit court interpreted the prenuptial agreement in accordance with the agreement's plain language.

Wife contends this interpretation is contrary to a strict construction of the agreement. Wife notes the principle of law that, when a prenuptial agreement purports to inhibit remedies provided by statute, it should be strictly construed. *King v. King*, 66 S.W.3d 28, 35 (Mo. App. 2001). Wife argues that the agreement inhibited Section 452.330.3's rule that property purchased during the marriage without the use of separate property is marital property, because it authorized Husband to purchase property during the marriage without the use of separate funds and characterize the property as either separate or marital based solely upon how he titled it.

This is not how the circuit court interpreted the agreement, nor is it how we interpret the agreement. The plain language of the agreement allowed each party to acquire separate property, with separate funds, during the marriage and title that property in their individual names. Moreover, the plain language of the agreement allowed the parties to keep as separate income from those separate properties. The canon of strict construction "'should not be applied to force a conclusion that the [parties] intended something other than what is expressed in the plain language of the [contract].'" *See BHA Group Holding, Inc. v. Pendergast*, 173 S.W.3d 373, 381 (Mo.

9

App. 2005) (citation omitted) (applying this principle in the context of statutory interpretation and noting that "strict construction 'does not mean that whenever a controversy is or can be raised of the meaning of a statute, ambiguity occurs, which immediately and inevitably determines the interpretation of the statute. Its proper office is to help to solve ambiguities, not to compel an immediate surrender to them.'" (citations omitted)).[3]

Wife also contends that the circuit court's interpretation was contrary to the court's August 2012 interlocutory order.[4] In the interlocutory order, the court stated that "any property acquired after the marriage, not specifically delineated in the original agreement or amendments as the sole and separate property of the parties, shall be subject to division in these dissolution proceedings." Wife argues that this finding in the interlocutory order limited the prenuptial agreement to exclude from marital property only that property that was specifically inventoried and listed as separate property in the exhibits attached to the agreement. While we do not agree with this interpretation of the court's interlocutory order, even if the interlocutory order did conflict with the court's judgment, the court was not bound by any of its findings in the interlocutory order. *Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co.*, 931 S.W.2d 166, 176 (Mo. App. 1996). "An interlocutory order may be reconsidered, amended, reversed or vacated by the trial court at any time prior to final judgment being entered." *Id.*

---

[3] Wife also argues that the circuit court erred in interpreting the agreement to apply to the division of property upon dissolution. She contends the parties intended that the agreement apply only upon one of their deaths. In her testimony during the trial on Husband's declaratory judgment claim, however, Wife admitted that, when she signed the prenuptial agreement, she "assumed it would apply in the event of divorce."

[4] The interlocutory order was entered by a different judge who retired in December 2012.

10

Wife next argues that, when interpreting the agreement, paragraphs two and four cannot be considered because they are merely recitals and not part of the agreement. Recitals, or "whereas" clauses, "are not strictly a part of the contract because they do not impose contractual duties on the parties." *State ex rel. Mo. Highway & Transp. Comm'n v. Maryville Land P'ship*, 62 S.W.3d 485, 492 (Mo. App. 2001). We note, however, that their purpose is to "shed light on the circumstances the parties wished to have considered in the interpretation of the contract." *Id.* Courts can consider recitals "to determine the intent of the parties when the operative language is ambiguous, uncertain, or indefinite." *G.H.H. Invs., L.L.C. v. Chesterfield Mgmt Assocs.*, L.P., 262 S.W.3d 687, 694 (Mo. App. 2008). Thus, the language of paragraphs two and four can be helpful in determining how the parties intended the prenuptial agreement to be interpreted and applied.

Wife further argues that Husband was judicially estopped from asserting that any of the property acquired during the marriage was his separate property because this position was inconsistent with the position he asserted in a summary judgment motion he filed almost two years before trial. "Under Missouri law, '[j]udicial estoppel applies to prevent litigants from taking a position in one judicial proceeding, thereby obtaining benefits from that position in that instance and, later, in a second proceeding, taking a contrary position in order to obtain benefits from such a contrary position at the time.'" *Brock v. McClure*, 404 S.W.3d 416, 420 (Mo. App. 2013) (citation omitted).

Wife mischaracterizes Husband's positions in both the summary judgment proceedings and at trial, as the record indicates that he consistently argued that the prenuptial agreement provided that property acquired during the marriage from separate

11

funds and titled in one party's sole name was separate property and that all income from such separate property remained separate. Additionally, the summary judgment proceedings were not a different proceeding, but were part of this "single case in process." *Owens v. ContiGroup Cos.*, 344 S.W.3d 717, 727 (Mo. App. 2011). Furthermore, Husband's summary judgment motion was denied, so he received no benefit or resolution on the merits from his summary judgment pleadings. *Id.* Judicial estoppel does not apply in this case.

Lastly, Wife argues that the court erred in treating Husband's brother, who is a lawyer, as an expert and adopting his opinion as legal authority for the court's interpretation of the prenuptial agreement. Wife asserts that the court must have relied upon Jeff Hanna's testimony to interpret the agreement because the court cited "no legal authority of its own" in the judgment. We reject this argument for several reasons.

First, the court was not required to make any specific findings or conclusions in its judgment, as none were requested under Rule 73.01. Second, the record does not support Wife's contention that the court treated Jeff Hanna as an expert. The first time that Wife objected to Jeff Hanna's testimony on the basis that it was expert legal testimony, the court stated that it would allow the testimony only for the limited purpose of showing the factual background of a transaction. The other time that Wife objected on this basis, the court sustained her objection. Third, it was Wife who solicited Jeff Hanna's expert opinion on cross-examination, as she asked him for his "legal opinion" as to how the prenuptial agreement should be interpreted. A party cannot invite error and then complain on appeal that the invited error was made. *Lau v. Pugh*, 299 S.W.3d 740, 757 (Mo. App. 2009). Wife's contention has no merit. Point I is denied.

12

***Reliance on Extrinsic Evidence***

In Point IV, Wife contends the court erred in relying on extrinsic evidence to interpret the terms of the prenuptial agreement. She bases her argument on the court's statements regarding the parties' conduct during the marriage. In the judgment, the court stated:

> Both [Wife] and [Husband] acknowledged the impact of their prenuptial agreement through their conduct in a variety of ways throughout their marriage. They acquired properties both in individual names and in joint names. Knowing the nature and extent of all assets, they apportioned them into separate trusts and a marital trust, understanding those acts to be taken under their prenuptial agreement. They managed their separate assets separately and did not commingle the funds earned from those assets. This conduct by the parties is both an acknowledgement of and affirmation by the parties of their agreements. Substantial properties were treated as marital by the parties, and other properties were treated as separate. Their actions are consistent with their intent in executing the prenuptial agreement, with its plain language, and the Court's rulings.

Wife argues that the court could not consider extrinsic evidence of the parties' conduct because it did not first find the judgment to be ambiguous.

We do not believe the court relied on the parties' conduct to interpret the agreement, however. The court's judgment indicates that it interpreted the agreement according to its plain language and was merely noting that the parties' actions were consistent with the agreement's plain language. This is not a case where the court impermissibly relied on conduct inconsistent with the contract's plain language to find that such conduct modified the contract. *See*, *e.g.*, *Melson v. Traxler*, 356 S.W.3d 264, 272-73 (Mo. App. 2011). Point IV is denied.

***Whether Agreement was Substantively Unconscionable***

13

In Point II, Wife contends the prenuptial agreement was invalid because it was substantively unconscionable. "'Substantive unconscionability refers to an undue harshness in the contract terms.'" *Potts v. Potts*, 303 S.W.3d 177, 187 (Mo. App. 2010) (citation omitted). A prenuptial agreement is substantively unconscionable when "'the inequality [is] so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it.'" *Miles v. Werle*, 977 S.W.2d 297, 303 (Mo. App. 1998) (citation omitted). A prenuptial agreement may be found unconscionable if it "attempts to totally take from one of the spouses his or her presumed right to marital property." *Id*. However, "[w]here a spouse retains at least a share of marital property in the antenuptial agreement, the agreement is likely enforceable." *King*, 66 S.W.3d at 36.

Here, the prenuptial agreement provided that the separate property of the parties was to remain separate, and that the income from those separate properties was also to remain separate. These provisions did result in a great disparity between the *separate* property set aside to each spouse. Because the agreement did not attempt to preclude an award of marital property to Wife, however, it was not unconscionable. *See id*.

The prenuptial agreement in this case is distinguishable from the prenuptial agreement found unconscionable in *Potts*, 303 S.W.3d at 188-90, the case upon which Wife relies. While the agreement in *Potts* removed all assets generated in the future from being marital, Husband and Wife's agreement protected as marital earnings from employment, increases in the value of retirement accounts, increases in the value of Husband's dental practice over $300,000, increases in the value of Husband's dental business accounts, and the Walnut Hills Apartments rental property. The marital

14

residence and a duplex rental, both of which were acquired during the marriage, also remained marital.  Additionally, while the *Potts* agreement left both parties responsible for debt, even when all earnings were shielded from becoming marital, the agreement in this case provided that each party would separately bear the expenses of their separate property.  Husband and Wife's prenuptial agreement was not substantively unconscionable.  Point II is denied.

***Classification of Property as Husband's Separate Property***

In Points III and V, Wife contends the court erred in classifying certain property as Husband's separate property.  She argues that the property at issue was acquired during the marriage without the use of separate funds and, therefore, should be classified as marital property.  In determining whether the circuit court abused its discretion in classifying this property as Husband's separate property, we will consider the evidence and inferences concerning the acquisition of the property in the light most favorable to the judgment, ignoring all evidence and inferences to the contrary.

The first parcel of property at issue in Point III is College Place Apartments.  Husband and his brother each acquired a 50% interest in this property in 2003.  Husband's interest was held in the name of his individual trust.  Husband and his brother obtained a $2.1 million loan to buy the property.  When they obtained the loan, the lender required Wife to sign a waiver of interest.  In the waiver of interest, Wife waived any ownership or other interest in the property that she had at that time or might have in the future, and the lender agreed that Wife would not be personally liable to repay the indebtedness.  During the marriage, Husband made capital contributions to this property from one of his accounts listed as separate in the exhibits attached to the

15

prenuptial agreement, and he used rental income generated by the property to pay the mortgage on the property. The court valued Husband's equity in College Place Apartments at $543,712 and classified this as his separate property.

The court correctly classified Husband's interest in this property as his separate property. Wife argues that, because a loan was used to acquire this property and income from the property was used to pay down the loan, College Place Apartments should be considered marital, citing *Selby v. Selby*, 149 S.W.3d 472, 485 (Mo. App. 2004). Although Husband did obtain a loan to acquire this property, Wife's waiver of interest relieved her of any responsibility whatsoever for that indebtedness. That Husband used income generated by the property to pay down the loan did not transmute the property into marital property, as the prenuptial agreement specifically provided that income from separate property was also separate property.

The second parcel of property at issue in Point III is Campus Apartments. Husband and his two brothers each held a 28% interest in this property, and his parents owned the remaining interest. Husband purchased his interest with a $100,000 loan from his parents, who then forgave the entire loan in increments of five $20,000 gifts to him. During the marriage, Husband used rental income generated by the property to pay the mortgage on the property. The court valued Husband's equity in Campus Apartments at $187,242 and classified this as his separate property.

The court correctly classified Campus Apartments as Husband's separate property. Under Section 452.330.2(2), property acquired by gift is separate property. Husband offered clear and convincing evidence that he acquired his interest in the property through a series of monetary gifts from his parents. Pursuant to the prenuptial

16

agreement, the income that was generated by this separate property, which Husband used to pay the mortgage on the property, was also his separate property.

The last parcel of property at issue in Point III is the commercial building on N. Adams. In 2006, Husband acquired a 100% interest this building, which housed his dental practice, when his parents deeded this property to his trust through a quit claim deed. As part of this transaction, Husband signed a ten-year balloon promissory note, payable to his parents, for $65,000. Husband offered evidence that his parents had wanted to make an outright gift of the property to him but, for tax-planning purposes, structured the transaction as a sale rather than a gift. Husband's evidence showed that his parents had decided, from the outset, to forgive the note in its entirety when it becomes due in 2016. The court valued Husband's equity in the N. Adams property at $100,000 and classified this as his separate property.

The circuit court correctly classified this property as Husband's separate property. Husband used no funds, let alone marital funds, to acquire his interest in the property from his parents. In light of the evidence that the transaction was structured as a sale merely for tax purposes, we defer to the circuit court's decision to accept Husband's evidence that his interest in the N. Adams property was a gift from his parents. Point III is denied.

In Point V, Wife asserts that the court erred in classifying the equity in the Vest duplexes as Husband's separate property. Husband constructed the Vest duplexes on property that the parties refer to as the "Bodenhamer property." Before the marriage, Husband's parents had conveyed to him a 50% interest in the Bodenhamer property, which was undeveloped at the time. In the prenuptial agreement, Husband and Wife

17

agreed that "[e]quity of a value no less than $100,000" in the Bodenhamer property would be Husband's separate property, and that any increases in the value of that asset would become marital property.

In the 1999 amendment to the prenuptial agreement, the parties modified this provision because the property was going to be platted into lots. The modification provided that one-half of the sale prices of each lot would be deposited into Husband and Wife's joint account, and the other half would belong to Husband's father. An accountant was then to determine one-half of the initial cost of the land in each lot and deposit that amount into Husband's separate account. The amount of the deposits was to total $100,000 when the last lot was sold, in order to enable Husband to recoup his initial $100,000 investment in the property. The amendment then provided that the parties could sell the lots to family members at cost. Husband and Wife agreed that they could purchase lots jointly but could not buy lots individually.

Two months after the 1999 amendment to the prenuptial agreement, Husband signed a warranty deed conveying his 50% interest in the Bodenhamer property to his individual trust. Wife also signed the warranty deed, in which she stated that she was "signing solely to release any marital rights which she may have in the property."

In 2001, Husband's parents gifted one lot of the Bodenhamer property to Wife and another lot Husband. Wife then sold her lot to Husband, who bought the property with his separate funds. Husband's parents gifted two more lots directly to Husband. In 2002, Husband and Wife agreed to transactions that transferred two other lots to Husband. The parties agreed that, as of October 16, 2002, Husband was "owed nothing out of [his] original $100,000 investment."

18

The end result of the transactions was that Husband's trust owned six lots of the Bodenhamer property. Husband then used his separate funds and a bank loan to construct the Vest duplexes on these lots. Husband used rental income generated from the property to pay the mortgage on the property. The court found that the value of Husband's equity in the property was $720,488 and classified this amount as his separate property.

The court correctly classified the equity in the Vest duplexes as Husband's separate property. In the amendments to the prenuptial agreement, the parties expressly memorialized the transactions that culminated in Husband's separately owning the platted lots on which the Vest duplexes were constructed. Husband used his separate funds and a bank loan to construct the duplexes. Pursuant to the prenuptial agreement, the income generated from this separate property, which Husband used to pay the bank loan, remained separate. Point V is denied.

### Failure to Include $134,000 in Marital Estate

In Point VI, Wife contends the court erred in refusing to restore to the marital estate $134,000, which she claims were marital funds that Husband unilaterally transferred to his separate account. In June 2006, shortly after Husband acquired his interest in the N. Adams property from his parents, he began depositing $1600 per month from his dental business accounts into one of his separate accounts. Wife asserts that, by the time of the dissolution, these deposits totaled $134,000. Per the 1999 amendment to the parties' prenuptial agreement, Husband's dental business accounts were joint marital property. Wife argues that the court erred in not restoring the $134,000 to the marital estate.

19

In response, Husband argues that the $134,000 constituted income from his separate property. He notes that, before he acquired his interest in N. Adams, he and his parents had a triple-net lease arrangement, in which the dental practice would make payments of $1600 per month to cover the taxes, insurance, and repairs on the building. According to Husband, he kept the triple-net lease arrangement in place after the property was transferred to his trust. Instead of paying his parents, though, his dental practice made the monthly $1600 payments to his trust.

The court did not err in failing to restore the $134,000 to the marital estate. The $1600 monthly rental payments were a business expense of his dental practice, which his dental practice would have had to pay to a third party if Husband's trust did not own the building. Because Husband's trust did own the building, the monthly rental payments to his trust constituted income from separate property. As Husband notes, if he had rented the property to a third party, the prenuptial agreement would have allowed him to keep the monthly payments as his separate property because they would have been income generated from separate property. That it was Husband's dental practice that rented Husband's separate property, instead of a third party, does not change this result. Point VI is denied.

### Incorrect Classification of Other Property

In Point VII, Wife contends the court erred in including Husband's dental business accounts in the value of Husband's dental practice when it classified and divided those assets. Wife argues that the dental business accounts and the dental practice were distinct assets, one marital and the other having both marital and

20

separate components; therefore, she asserts that they should not have been considered together.

The 1999 amendment to the prenuptial agreement specifically listed Husband's dental business accounts as joint marital property, while the exhibits attached to the prenuptial agreement provided that only the first $300,000 of the value of Husband's dental practice was Husband's separate property. Before trial, the parties stipulated that the value of Husband's dental practice was $330,000 and that $300,000 of this value was Husband's separate property. It was undisputed that the value of Husband's dental business accounts was $12,424.

In its judgment, the court valued Husband's dental practice at $330,000 and found that $300,000 of this value was Husband's separate property. The court found that the remaining $30,000 value of the dental practice was marital property and that this $30,000 included the value of the dental business accounts. The court awarded the $30,000 to Husband. Wife argues the dental business accounts were distinct assets and should not have been included in the $30,000 marital portion of the value of Husband's dental practice.

At trial, Husband testified that he did not believe the dental business accounts had a distinct value to be counted over and above the agreed-upon value of his dental practice. We defer to the circuit court's decision to believe Husband's testimony.

Also in Point VII, Wife contends the court erred in not classifying as marital $30,995 from the sale of a house on the Bodenhamer property in 1999. Husband had transferred these proceeds into his separate account. Wife notes that, in the exhibits attached to the prenuptial agreement, the parties agreed that the first $100,000 of equity

21

in the Bodenhamer property was Husband's separate property. The amendments to the prenuptial agreement indicated that Husband received his $100,000 in equity through a series of transactions in which Wife transferred $100,000 in lots and cash to Husband. The amendments provided that, as of October 2002, Husband was "owed nothing out of [the] original $100,000." Wife argues that, because Husband's first $100,000 was satisfied by virtue of the lot and cash transfers memorialized in the amendments, the court should have included the $30,995 from the 1999 sale of a house on the Bodenhamer property as marital property.

We need not decide whether the court erred in not classifying this $30,995 as marital property because, even if the court did err, Wife fails to show that she was prejudiced by the error. Wife received $891,897 of the marital property plus $20,000 in cash from Husband, compared to Husband's award of $775,196 of the marital property. Wife has neither alleged nor demonstrated that the court's failure to classify the $30,995 as marital property rendered this division of property unfair. *Shaw v. Shaw*, 413 S.W.3d 332, 337 (Mo. App. 2013); *Burk v. Burk*, 936 S.W.2d 144, 146 (Mo. App. 1996). Point VII is denied.

### Denial of Maintenance

In Point VIII, Wife contends the court erred in denying her request for maintenance. "The goal of a maintenance award is to close the gap between a spouse's income and his or her monthly expenses." *Sparks*, 417 S.W.3d at 295. The court will award maintenance only if it finds that the party requesting maintenance "(1) Lacks sufficient property, including marital property apportioned to him, to provide for

22

his reasonable needs; and (2) Is unable to support himself through appropriate employment[.]"  § 452.335.1.  Thus, in making this decision, the court first determines the requesting party's reasonable needs and then determines whether the party can meet those needs through appropriate employment.  *Sparks*, 417 S.W.3d at 296.

The court denied Wife's request for maintenance after finding that Wife suffered no physical limitations, was capable of employment, and was presently employed and earning $29,000 annually.  The court further found that Wife had income-producing potential based upon the court's division of assets, as the court awarded her an apartment complex and a duplex, both of which generated rental income and were marital property.  Additionally, the court set aside to Wife as her separate property a rental house from which she was voluntarily forgoing rental income by allowing her daughter to live there for free.[5]  The court noted that, since the parties were married in 1997, Wife had suffered no setback in her ability to support herself as a result of the marriage but, instead, had acquired substantial marital interest in real property and retirement funds that were set off to her.  As for Wife's expenses, the court noted that she had presented multiple expense statements throughout the case.  Her monthly expenses in these statements ranged from $3860 to $10,734 in her most recent statement, which the court expressly rejected as not credible.  The court concluded that Wife's earnings from her employment and income-producing property "far exceed[ed]" her reasonable needs and, therefore, she was not in need of maintenance.

Wife argues that the court erred in denying her maintenance because it failed to make specific findings of fact regarding the amount of her reasonable needs and

---

[5] The evidence favorable to the judgment was that Wife was forgoing approximately $10,800 per year in rental income on this house.

23

income. As noted *supra*, neither party asked for specific findings of fact on any issues under Rule 73.01(c). Therefore, none were required on these issues.

Wife next asserts that the court erred in rejecting her most recent statement of anticipated income and expenses, in which she claimed that her expenses were $10,734. While the case was pending, Wife filed four income and expense statements with the court. In those statements, she claimed that her monthly expenses were $6640, $5240, $3860, and $10,734. In light of these varied amounts of claimed expenses, the court could reasonably find that the $10,734 amount was not credible. We defer to the court's credibility determination.

Wife further argues that the court erroneously based its decision to deny her maintenance on its allocation of the marital rental properties to her, which she contends have a variable and speculative cash flow depending upon rental levels. The evidence favorable to the judgment was that, after the mortgages were paid, the marital rental properties generated a cash flow of $24,595 in 2009 and $20,295 in 2010, and that this amount could increase if Wife refinanced the mortgages upon removing Husband's name. Although Wife testified that there was a possibility that not all of the units would be rented and, therefore, her rental income would decrease, we defer to the circuit court's decision to find otherwise. The court did not err in denying Wife's request for maintenance.[6] Point VIII is denied.

## CONCLUSION

The court's judgment as to Points I through VIII is affirmed.

---

[6] Wife also argues that the court erred in making its denial of maintenance non-modifiable. In support of her argument, she notes the general rule that modifiable maintenance awards are preferable to non-modifiable awards. While this is the general rule when the court *grants* maintenance, *see, e.g.*, *Sweet v. Sweet*, 154 S.W.3d 499, 509 (Mo. App. 2005), Wife cites no authority that this rule applies when the court *denies* maintenance.

24