In the Missouri Court of Appeals
 Eastern District
 DIVISION ONE

 PELOPIDAS, LLC, ET AL., ) No. ED109395
 )
 Respondents, ) Appeal from the Circuit Court of
 ) St. Louis County
 vs. )
 ) Honorable Dean P. Waldemer
 RACHEL KELLER, )
 )
 Appellant. ) Filed: August 10, 2021

 OPINION
 Rachel Keller (“Keller”) appeals from the judgment of the Circuit Court of St. Louis

County, entered on November 30, 2020 (“Judgment”), which fully disposed of all the claims

filed against her by Pelopidas, LLC (“Pelopidas”) and Travis Brown (“Brown”) (Pelopidas and

Brown are hereinafter collectively the “Respondents”), as well as fully disposed of Keller’s

counterclaim against Respondents in this matter. The Judgment granted Respondents’ motion

for summary judgment against Keller with respect to Respondents’ claims for breach of contract

and a declaration that Keller had transferred her fifty percent (50%) ownership interest in

Pelopidas to Brown, effective September 30, 2019, which was the date the parties initially agreed

to resolve their prior lawsuit that Keller had commenced in 2016 (“2016 Lawsuit”). The

Judgment also denied Keller’s motion for summary judgment against Respondents with respect

to her counterclaim seeking damages for their alleged failure and refusal to make an accelerated

payment of $8.6 million pursuant to the terms of the settlement of the 2016 Lawsuit. In the
Judgment, the circuit court also: (1) sua sponte dismissed Keller’s counterclaim against

Respondents with prejudice; (2) enjoined Keller from claiming that she was still a member or

owned fifty percent (50%) of Pelopidas; (3) instructed the parties to execute a written agreement

to finalize the settlement of the 2016 Lawsuit whereupon Keller was to be paid the second

installment payment of $1.1 million that Brown had placed in escrow; (4) denied all remaining

claims asserted in this case; and (5) ordered Keller to pay Respondents’ attorneys’ fees in the

amount of $408,326.

 Keller raises six points on appeal, arguing that the circuit court erred in various ways in

granting summary judgment for Respondents on their claims and her own counterclaim, denying

her cross-motion for summary judgment with respect to Respondents’ claims, sua sponte

dismissing her counterclaim, and awarding Respondents their attorneys’ fees.

 We reverse and remand.

 I. Factual and Procedural Background

 A. Relationship of the parties

 In 2007, Keller and Brown, who were married at the time, formed Pelopidas as a holding

company for several “media-related brands,” which engaged in certain political work and other

related activities for a wealthy investor and political activist (“Investor”). At all relevant times,

Keller and Brown each owned a fifty percent (50%) interest in Pelopidas. Keller and Brown

divorced in 2014, but thereafter agreed to retain their respective ownership interests in Pelopidas.

Brown became the company’s sole manager, and Keller remained an employee of the company,

drawing a salary and other benefits.

 2
 B. The 2016 Lawsuit and related events

 In 2016, Keller commenced a lawsuit against Brown and Pelopidas, which sought

damages and other relief arising from Brown’s management of the company (“2016 Lawsuit”).

Keller amended her petition several times, and following the dismissal of Pelopidas on March 6,

2019, she ultimately asserted six counts against Brown in her Verified Fourth Amended Petition.

Keller alleged a variety of financial misconduct and breaches of fiduciary duty, including

allegations that Brown used certain “phony loans” to steal large amounts money from Pelopidas

and that he had wrongfully caused Pelopidas to terminate her employment with the company

when she reported his unlawful activity. Keller also asserted a derivative claim against Brown

on behalf of Pelopidas, in which she raised similar issues of misconduct and breaches of

fiduciary duty.

 In September 2019, two additional key events occurred: (1) Brown resigned as the sole

manager of Pelopidas; and (2) Investor—the company’s largest client and source of revenue—

terminated his relationship with Pelopidas.1

 C. Settlement of the 2016 Lawsuit

 On September 30, 2019, the parties met with a mediator in an effort to resolve the claims

asserted by Keller in the 2016 Lawsuit.2 After an all-day mediation session that lasted late into

the evening, the parties entered into a written agreement, entitled “Memorandum of Settlement”

(“Settlement Memorandum”), whereby Keller agreed to transfer her fifty percent (50%)

ownership interest in Pelopidas to Respondents, and in exchange Respondents agreed to pay

1
 At oral argument, Respondents’ counsel represented that Pelopidas is now out of business, and thus, has no
income. However, the parties also acknowledged that there is no evidence in the summary judgment record to this
effect.
2
 Although Pelopidas had been dismissed from the 2016 Lawsuit, it nonetheless participated in the mediation with
the consent of Keller and Brown.

 3
Keller a total of $8.85 million. Although the Settlement Memorandum contained several other

key terms, the parties acknowledge that the single-most important provision was the transfer of

Keller’s fifty percent (50%) membership interest in Pelopidas to Respondents, which was

memorialized in ¶ 7 of the Settlement Memorandum as follows: “Plaintiff’s stock shall be

surrendered/sold, escrowed and pledged back to plaintiff” (emphasis added).3 In addition, ¶ 1 of

the Settlement Memorandum contained a payment schedule requiring Respondents to pay the

$8.85 million to Keller in eight separate installments of varying amounts between October 31,

2019, and April 1, 2023.

 The Settlement Memorandum does not state the effective date for the transfer of Keller’s

“stock” in Pelopidas (which, as will be addressed more fully below, is the core issue in this case),

nor does it state when the escrowing and pledging back of Keller’s “stock” will occur.

Nevertheless, the introductory paragraph of the Settlement Memorandum specifically

contemplates that the parties will, on some unspecified future date(s), prepare and execute

supplemental documents to fully consummate their agreement, where the parties agreed as

follows: “The parties shall jointly prepare a formal settlement agreement and release and all

appropriate purchase and sale documents that include the following terms….” The Settlement

Memorandum contains a total of twenty-one (21) numbered paragraphs, several of which are

discussed below.

 Paragraph 2 provides that the “settlement agreement” the parties contemplated executing

on some future date must provide that Respondents’ ongoing payment obligations will be

3
 The parties acknowledge that because Pelopidas was a limited liability company (not a corporation), Keller’s fifty
percent (50%) membership interest in Pelopidas was not actually represented by stock or stock certificates, as
suggested in ¶ 7 of the Settlement Memorandum; accordingly, the parties always understood that the “stock”
referenced in ¶ 7 referred to Plaintiff’s fifty percent (50%) membership interest in Pelopidas. Thus, in order to be
consistent with this language of the Settlement Memorandum, we likewise refer to Keller’s “stock” in Pelopidas
throughout the remainder of this opinion.

 4
reduced in any year in which Pelopidas’s revenues fall below $10,000,000, in which case the

required payments for that calendar year will be prorated based on the shortfall. Thus, it appears

that if Pelopidas had zero revenue in a given year during the period the installment payments

were due, then Respondents would not owe Keller any of the required payments for that year.

The following is a summary of the other relevant provisions in the Settlement Memorandum:

 • Paragraph 6 provides that Keller is entitled to one percent (1.0%) interest on any
 “balances due and unpaid;”

 • Paragraph 8 provides that there must be “[r]easonable notice and cure
 provisions” (but does not further explain what this entails);

 • Paragraph 9 provides that the 2016 Lawsuit “shall be dismissed without
 prejudice,” but further provides that Keller “shall execute a covenant not to
 sue;”

 • Paragraph 10 provides that the parties must execute a mutual “Full and General
 Release” with respect to “all claims known or unknown through the date set
 forth on the Release, excepting the obligations set forth in the settlement
 documents;”

 • Paragraph 11 provides that if any of the required installment payments are
 missed and not cured, “all payments are accelerated” and Keller may file suit to
 enforce the parties’ settlement, including all interest due. This clause further
 provides that Respondents waive “all defenses” in any lawsuit filed to enforce
 the payment provisions of the parties’ settlement, except the defenses of “accord
 and satisfaction” and “breach of the covenant not to sue;”

 • Paragraph 12 provides that Respondents “shall use their best efforts to remove
 [Keller] from all debts, loans, lines of credit, and leases [of Pelopidas];”

 • Paragraph 14 provides that “[i]nsurance beneficiary changes shall be allowed
 upon execution of settlement documents, but all other Florida MSA obligations
 shall remain in place;” and

 • Paragraph 19 provides as follows: “Attorneys’ fees to prevailing party if a party
 sues to enforce settlement agreement, release or buy-sell documents.”

Finally, the Settlement Memorandum contains several other standard contract provisions not

relevant to the issues raised in this appeal.

 5
 D. The parties’ attempts to prepare and finalize the contemplated settlement documents

 Following the parties’ execution of the Settlement Memorandum on September 30, 2019,

they began the process of completing the additional tasks required therein, including drafting the

documents necessary to effectuate the transfer of Keller’s “stock” to Respondents, as set forth in

¶ 7. For example, pursuant to ¶ 12, Respondents removed Keller as a guarantor of Pelopidas’s

lease agreement. In addition, the parties do not dispute that Respondents made the initial

installment payment of $250,000 required under ¶ 1(a) of the Settlement Memorandum on or

before October 31, 2019. However, with respect to the second installment payment of $1.1

million required under ¶ 1(b), Respondents did not pay that amount to Keller on or before the

due date of April 1, 2020; rather, for reasons explained below, Respondents unilaterally paid that

amount into escrow and made it payable to Keller upon her execution of Respondents’ version of

the additional settlement documents contemplated in the Settlement Memorandum.

 For her part, Keller timely dismissed the 2016 Lawsuit without prejudice on January 10,

2020, as required in ¶ 9 of the Settlement Memorandum. In the dismissal, Keller represented to

the circuit court that, “[a]ll essential terms of the parties’ agreement were included in [the

Settlement Memorandum].” Respondents have also made several representations in briefings to

the circuit court and this Court that the Settlement Memorandum contains all the essential terms

for their agreement in order to be effective and binding on the parties. Thus, although the parties

disagree on many things, they do agree on this basic proposition.

 With respect to the transfer of Keller’s “stock” in Pelopidas, although the parties

exchanged several drafts of the supplemental documentation necessary to accomplish this key

requirement in the months following the execution of the Settlement Memorandum and agreed

on much of the necessary language, they ultimately reached an impasse in early 2020 with

 6
respect to the effective date of the “stock” transfer. Specifically, Respondents demanded that

Keller sign documents reflecting an effective date of September 30, 2019, which was the same

date the Settlement Memorandum was executed, and which Keller refused to sign. In addition,

although several early versions of Respondents’ proposed documents did not contain the

necessary escrow and pledge back provisions, Brown subsequently agreed to include a pledge

back provision. On the other hand, Keller proffered documents that reflected an effective date as

of the date the parties actually executed the supplemental documents, which Respondents refused

to sign. Thus, the parties still have not signed the key supplemental documents contemplated in

the Settlement Memorandum.

 In support of their respective positions, both parties have primarily relied on the plain

language of ¶ 7 of the Settlement Memorandum, which provides as follows: “Plaintiff’s stock

shall be surrendered/sold, escrowed and pledged back to Plaintiff” (emphasis added). Keller

argues that “shall be” is the operative phrase in ¶ 7, which she asserts clearly indicate that the

transferring, escrowing, and pledging back of her “stock” was not intended to occur on

September 30, 2019, but rather, would occur on some future date (i.e., whenever the parties

could negotiate, draft, and execute the necessary supplemental documentation). Conversely,

Respondents argue that ¶ 7 clearly contemplates an immediate transfer of Keller’s “stock,”

notwithstanding the use of “shall be,” and notwithstanding the undisputed fact that the parties did

not execute any documents effecting the escrowing and pledging back of Keller’s “stock” on

September 30, 2019. As further explained below (see infra III. Discussion, Points IV and V),

the resolution of this issue is dispositive of this appeal.4

4
 Although not critical to the disposition of this appeal, it is not entirely clear why the parties are so concerned about
the effective date of the transfer of Keller’s “stock,” which appears to be the sole stumbling block to their full and
final resolution of the underlying dispute that is the genesis of this matter. For her part, Keller appears to be
primarily concerned about a potential misrepresentation to the IRS if the supplemental settlement documents reflect

 7
 As noted, Respondents did not make the second installment payment of $1.1 million to

Keller on the due date of April 1, 2020. Rather, Respondents unilaterally placed this amount in

escrow and made it payable to Keller upon her execution of Respondents’ version of the

additional settlement documents contemplated in the Settlement Memorandum, which

Respondents insisted reflect an effective date for the transfer of Keller’s “stock” of September

30, 2019.5 Respondents claim they did so because of the impasse regarding the effective date of

the transfer of Keller’s “stock,” as the parties had still not fully agreed upon or executed any of

the supplemental documents contemplated in ¶ 7 of the Settlement Memorandum when the due

date for the second installment payment arrived. After missing the April 1 payment deadline,

Keller gave Respondents notice and an opportunity to cure by April 7, but the second payment

was not forthcoming.6 Thus, pursuant to ¶ 11 of the Settlement Memorandum, all then-

outstanding payments due were accelerated (which totaled $8.6 million at the time), and Keller

declared that Respondents had defaulted on the Settlement Memorandum.

 E. The current lawsuit

 Following the breakdown of the parties’ negotiations to finalize the necessary

supplemental documents contemplated in the Settlement Memorandum, Respondents

that the “stock” transfer was effective as of September 30, 2019, but the documents are executed on some later date.
However, as long as the supplemental documents clearly reflect the actual execution date thereof, it is not clear how
that would be deceptive or misleading. On the other hand, Brown appears to be mired in his belief that the parties
simply agreed to an effective date of September 30, 2019, and he is sticking to it at all costs. In response, based on
her prior experience with Brown, Keller appears convinced that he has some nefarious objective for insisting on an
effective date of September 30, 2019, which she claims is a practice he has used in the past to steal hundreds of
thousands of dollars from Pelopidas via bogus “loans” from the company using backdated documents. Regardless
of the parties’ reasons for their respective positions regarding how the operative language in ¶ 7 of the Settlement
Memorandum should be interpreted, this is apparently the hill they are each willing to die on in disposing of this
appeal, leaving us to decide who will remain standing (figuratively, of course).
5
 Keller maintains that Respondents’ unilateral act of placing the second installment payment required under ¶ 1(b)
in escrow was not permitted under the terms of the Settlement Memorandum. As further explained below, we agree.
6
 Pursuant to the Judgment subsequently entered by the circuit court in this case on November 30, 2020, the
escrowed amount of $1.1 million was paid to Keller sometime thereafter.

 8
commenced this lawsuit on February 21, 2020, by filing their initial petition, as amended on

April 6, 2020 (“Enforcement Petition”), which seeks to enforce the Settlement Memorandum.

The Enforcement Petition asserts the following four claims against Keller: Count I seeks a

declaratory judgment that, inter alia, Keller lost all right, title, and interest in and to Pelopidas,

effective September 30, 2019, and that she must effectuate all documents and take all actions set

forth in the Settlement Memorandum; Count II seeks an order requiring Keller to execute the

“necessary settlement documents” acknowledging the assignment of her interest in Pelopidas on

September 30, 2019; Count III is a claim for breach of contract alleging that Respondents have

been damaged by Keller’s refusal to execute a document acknowledging the assignment of her

interest in Pelopidas effective September 30, 2019; and Count IV is a petition for preliminary

and permanent injunction seeking: (a) to “compel settlement according to the terms of the

[Settlement Memorandum] and specifically an acknowledgement that Keller’s right, title and

interest in Pelopidas were assigned as of September 30, 2019”; and (b) an order enjoining Keller

from “making any false and erroneous statements to the effect that she is an owner/member of

Pelopidas after September 30, 2019.” In each count of the Enforcement Petition, Respondents

also seek their reasonable attorneys’ fees.

 On April 16, 2020, Keller filed her one-count counterclaim in this matter

(“Counterclaim”), which asserted a claim for breach of contract against Respondents arising

from the Settlement Memorandum. Keller alleges that the Settlement Memorandum is an

“enforceable contract” and that Respondents are in breach thereof for missing the second

installment payment due on April 1, 2020, which accelerated all then-outstanding payments, for

total damages of $8.6 million, plus interest of 1.0% per month pursuant to ¶ 6 of the Settlement

Memorandum. Keller further alleges that, pursuant to ¶ 11 of the Settlement Memorandum,

 9
Respondents have waived any affirmative defenses to a suit to enforce the failure to make a

payment required under ¶ 1, except the defenses of “accord and satisfaction” and “breach of the

covenant not to sue.” With respect to the defense of accord and satisfaction, Keller alleges that

this defense is not available to Respondents because they have not paid Keller the entire $8.85

million due.7 Regarding the defense of breach of the covenant not to sue, Keller also alleges that

this defense is not available to Respondents because, after dismissing the 2016 Lawsuit, she did

not file a lawsuit against Respondents “at any time before they failed to pay on April 1, 2020,

and failed to cure by April 7, 2020.” In her Counterclaim, Keller also seeks her attorneys’ fees

and costs.

 F. The parties’ motions for summary judgment and the judgment thereon

 Following the parties filing the foregoing claims in this matter, they then filed their

respective motions for summary judgment. First, Keller filed her motion for summary judgment

with respect to her Counterclaim (seeking $8.6 million in damages arising from the missed

second installment payment, plus 1.0% monthly interest and attorneys’ fees). Second,

Respondents filed their own motion for summary judgment with respect to each count of the

Enforcement Petition and Keller’s affirmative defenses thereto. Third, Keller filed her cross-

motion for summary judgment with respect to each count of the Enforcement Petition. These

three motions sought summary disposition of all claims pending before the circuit court.

7
 It is worth noting that Keller did not allege that Respondents breached the Settlement Memorandum by not
executing supplemental documentation reflecting an effective date of the “stock” transfer as of the same date the
parties execute said documentation (which she had proffered to Respondents prior to their commencement of this
action). Thus, we need not decide whether Respondents’ refusal to execute Keller’s proffered documentation,
standing alone, would constitute a material breach of the Settlement Memorandum (which would, in turn, involve
determining, inter alia, whether Respondents failed to execute said documentation within a reasonable period of
time after entering into the Settlement Memorandum). This is because, first, Keller did not plead such a breach in
her Counterclaim, and second, as explained below (see infra III. Discussion, Points I, III), we find that
Respondents’ failure to make the second installment payment of $1.1 million to Keller by the due date of April 1,
2020, and to cure within a reasonable time after notice, standing alone, constitutes a breach of the Settlement
Memorandum.

 10
 Following a full briefing on the parties’ summary judgment motions, the circuit court

held a hearing thereon. After permitting the parties to submit proposed orders, the circuit court

issued its First Amended Judgment and Order on November 30, 2020 (“Judgment”), which fully

disposed of all the parties’ claims. As a preliminary matter, the circuit court noted that, “[b]y

each party’s admission in their pleadings, they entered into an enforceable settlement agreement

evidenced by the [Settlement Memorandum].” The circuit court also noted that the parties agree

they “resolved their dispute on September 30, 2019, by entering into an enforceable contract,”

which they further agree “contains all the essential terms of their contract.” Without substantial

explanation, the circuit court made the following key findings: (1) the Settlement Memorandum

was a “valid and enforceable contract;” (2) no additional documents or terms are needed to

effectuate the contract; (3) Respondents “performed or tendered performance pursuant to the

contract;” and (4) Keller “surrendered, transferred and assigned all right, title and interest in

Pelopidas, LLC effective September 30, 2019.” Based on the foregoing findings, the circuit

court ordered, adjudged, and decreed as follows:

 • Granted Respondents’ motion for summary judgment with respect to the claims
 in the Enforcement Petition, and entered judgment in favor of Respondents and
 against Keller;

 • Denied Keller’s motion for summary judgment with respect to the claims in the
 Enforcement Petition;

 • Denied Keller’s motion for summary judgment with respect to her
 Counterclaim; in addition, the circuit court, sua sponte, dismissed Keller’s
 Counterclaim with prejudice;

 • Permanently enjoined Keller from “making statements to the effect that she was
 an owner or Member of Pelopidas, LLC after September 30, 2019;”

 • Ordered the parties to execute a “settlement agreement” reflecting the Judgment
 no later than November 30, 2020, which was the day the judgment was issued,
 whereupon the second installment payment of $1.1 million held in escrow was
 to be paid to Keller;

 11
 • Found that the proof of attorneys’ fees that Respondents had previously
 submitted (via a hearing on November 18, 2020) was “reasonable and necessary
 in the context of the case,” and entered judgment in favor of Brown as and for
 his attorneys’ fees and expenses against Keller in the amount of $244,753.50, as
 well as entered judgment in favor of Pelopidas as and for its attorneys’ fees and
 expenses against Keller in the amount of $163,578.00;

 • All claims not specifically enumerated in the Judgment were denied; and

 • Taxable costs were assessed against Keller.

 This appeal followed.

 II. Standard of Review

 The Supreme Court of Missouri recently affirmed the standard of review for summary

judgment as follows in Green v. Fotoohighiam:

 The trial court makes its decision to grant summary judgment based on the
 pleadings, record submitted, and the law; therefore, this Court need not defer to
 the trial court’s determination and reviews the grant of summary judgment de
 novo. In reviewing the decision to grant summary judgment, this Court applies
 the same criteria as the trial court in determining whether summary judgment was
 proper. Summary judgment is only proper if the moving party establishes that
 there is no genuine issue as to the material facts and that the movant is entitled to
 judgment as a matter of law. The facts contained in affidavits or otherwise in
 support of a party’s motion are accepted as true unless contradicted by the non-
 moving party’s response to the summary judgment motion. Only genuine
 disputes as to material facts preclude summary judgment. A material fact in the
 context of summary judgment is one from which the right to judgment flows.

 ***

 The record below is reviewed in the light most favorable to the party against
 whom summary judgment was entered, and that party is entitled to the benefit of
 all reasonable inferences from the record. However, facts contained in affidavits
 or otherwise in support of the party’s motion are accepted as true unless
 contradicted by the non-moving party’s response to the summary judgment
 motion.

606 S.W.3d 113, 115-16 (Mo. banc 2020) (quoting Goerlitz v. City of Maryville, 333 S.W.3d

450, 452-53 (Mo. banc 2011)). “In addition, the non-movant must support denials with specific

 12
references to discovery, exhibits, or affidavits demonstrating a genuine factual issue for trial.

Rule 74.04(c)(2), (c)(4).8 Facts not properly supported under Rule 74.04(c)(2) or (c)(4) are

deemed admitted.” Id. at 116 (quoting Cent. Trust & Inv. Co. v. Signalpoint Asset Mgmt., LLC,

422 S.W.3d 312, 320 (Mo. banc 2014)).

 III. Discussion

 Keller raises six points on appeal. In her first point, Keller argues that the circuit court

erred as a matter of law in sua sponte dismissing her Counterclaim for failure to state a claim

upon which relief can be granted because she pleaded the elements of a claim for breach of

contract against Brown. In her second point, Keller argues that the circuit court erred as a matter

of law in sua sponte granting summary judgment for Respondents with respect to her

Counterclaim because it did not have the authority to do so in that summary judgment is not

available absent a proper motion filed pursuant to Rule 74.04 or Rule 55.27(a)(6) and

Respondents filed no such motion. In her third point, Keller argues that the circuit court erred as

a matter of law in denying her motion for summary judgment with respect to her Counterclaim

because the summary judgment record established that she was entitled to judgment as a matter

of law and there was no genuine dispute regarding the facts supporting her breach of contract

claim against Respondents. In her fourth point, Keller argues that the circuit court erred in

granting summary judgment in favor of Respondents with respect to the claims in their

Enforcement Petition because Respondents were not entitled to judgment as a matter of law in

that the Settlement Memorandum contained a promise of future performance regarding the

transfer of her “stock” in Pelopidas to Brown. In her fifth point, Keller argues that the circuit

court erred as a matter of law in denying her cross-motion for summary judgment with respect to

8
 All rule references are to Missouri Supreme Court Rules (2020).

 13
the claims against her in the Enforcement Petition because she was entitled to judgment as a

matter of law for the same reasons asserted in her fourth point. In her sixth point, Keller argues

that the circuit court erred in awarding attorneys’ fees to Respondents because they were not the

prevailing party in that Keller is entitled to summary judgment with respect to both her

Counterclaim and the claims in the Enforcement Petition as a matter of law.

 Because the arguments raised in Keller’s fourth and fifth points are dispositive of this

appeal, we address them first, and then address Keller’s remaining points accordingly.

 Points IV and V

 Keller’s fourth and fifth points on appeal address the parties’ cross-motions for summary

judgment with respect to Respondents’ claims against Keller arising from the Settlement

Memorandum. The dispositive issue raised in these two points involves the parties’ dispute

regarding when the transfer of Keller’s “stock” would occur pursuant to ¶ 7 of the Settlement

Memorandum. As noted above, Respondents maintain that this transfer occurred on September

30, 2019—the same date the parties entered into the Settlement Memorandum. On the other

hand, Keller maintains that under the plain language of ¶ 7, the transfer has not yet occurred;

rather, the parties agreed that the transfer would be effective as of the date they execute the

supplemental documentation contemplated in the Settlement Memorandum (which still has not

taken place). Thus, the parties’ dispute raises a simple issue of contract interpretation, which, as

further discussed below, is a question of law that may be resolved via summary judgment.

 It is well established that “[t]he cardinal principle for contract interpretation is to

ascertain the intention of the parties and to give effect to that intent.” State ex rel. Missouri

Highway and Transp. Com’n v. Maryville Land Partnership, 62 S.W.3d 485, 491 (Mo. App.

E.D. 2001). To that end, “[w]e use the plain, ordinary, and usual meaning of the contract’s

 14
words and consider the document as a whole.” Id. “Each term and clause is construed to avoid

an effect that renders other terms and provisions meaningless.” Id. at 492. “A construction

attributing a reasonable meaning to each phrase and clause, and harmonizing all provisions of the

agreement is preferred to one that leaves some of the provisions without function or sense.” Id.

 Furthermore, summary judgment is only appropriate in contract cases “where the

language of the agreement is so clear and unambiguous that the meaning of the portion of the

contract in dispute is so apparent that it may be ascertained from the four corners of the

document.” Zeiser v. Tajkarimi, 184 S.W.3d 128, 132 (Mo. App. E.D. 2006) (quoting Board of

Educ. City of St. Louis v. State, 134 S.W.3d 689, 695 (Mo. App. E.D. 2004)). However,

“[s]ummary judgment is inappropriate in an action arising out of a contract … where the

disputed contract language is ambiguous and parol evidence is required to interpret the contract

and the parties’ intent.” Id. (quoting Northwest Plaza, L.L.C. v. Michael-Glen, Inc., 102 S.W.3d

at 552, 557 (Mo. App. E.D. 2003)). “Where a contract is ambiguous, then a question of fact

arises as to the intent of the parties as to its meaning, and thus it is error to grant summary

judgment.” Id. at 132-33. In those cases, “the determination of the parties’ intent should be left

to the jury.” Id. at 133.

 “Whether a contract is ambiguous is a question of law for the court, that we determine

without deference to the trial court’s decision.” Id. But “[a] contract is not ambiguous merely

because the parties disagree as to its construction.” Id. “Rather, a contract is ambiguous only if

its terms are susceptible of more than one meaning so that reasonable persons may fairly and

honestly differ in their construction of the terms.” Id. “[I]f language which appears plain

considered alone conflicts with other language in the contract, or if giving effect to it would

render other parts of the contract a nullity, then we will find the contract to be ambiguous.” Id.

 15
 In this case, although the parties clearly disagree regarding the meaning of ¶ 7 of the

Settlement Memorandum, they appear to agree that it is not ambiguous with respect to when the

transfer of Keller’s “stock” was to occur. Thus, neither party is asking this Court to remand for a

factual determination by a jury regarding their intent on this critical issue. Accordingly, the

parties are content for this Court to decide this key issue based on the summary judgment record

they presented to the circuit court in connection with their respective motions. We agree with

the parties that ¶ 7 is not ambiguous, as we do not believe it could have more than one meaning,

or that reasonable persons could fairly and honestly differ in their interpretation of ¶ 7.

Therefore, we next address whether Keller’s or Respondents’ proposed interpretation of ¶ 7 is

correct.

 As an initial matter, we note that ¶ 7 clearly commands that Keller’s “stock” must be

surrendered/sold to Respondents, escrowed, and pledged back to Keller. Furthermore, it is plain

to see that the parties intended for each of these things to occur either on September 30, 2019 (as

Respondents have argued), or sometime later (as Keller has argued). This is because the

operative words in ¶ 7—“shall be”—plainly apply to each of these three requirements. Thus,

this case requires us to determine whether the parties’ use of the words “shall be” in ¶ 7

expressed an intent for these three requirements to create an immediate performance or to impose

a future obligation.

 In analyzing the plain, ordinary, and usual meaning of the words “shall be,” as used in ¶ 7

of the Settlement Memorandum, and considering the parties’ use of these words in view of the

entire document, we determine that they express an intent for these three requirements to impose

a future obligation (and not to effect an immediate performance). We reach this determination

 16
because, very simply, it is the only reasonable interpretation of the words “shall be” in ¶ 7, which

clearly commands that each of these requirements occur sometime after September 30, 2019.

 In her briefing to this Court, Keller primarily relied on the A.B.A’s A Manual of Style for

Contract Drafting, a highly regarded authority on contract drafting. See Kenneth A. Adams, A

Manual of Style of Contract Drafting (4th ed. 2017) [hereinafter Manual of Style]. The Manual

of Style notes that drafters can employ different types of operative language in a contract,

including “language of performance” and “language of obligation,” among other types. Id. at

43-47. Language of performance, which expresses actions accomplished by means of signing

the contract itself, is typically accomplished by use of the word “hereby.” Id. at 51-52. In

contrast, language of obligation is used to state any duty a contract imposes on one or more

parties and is typically accomplished by use of the word “shall.” Id. at 57-58. More to the point,

§ 3.73 of the Manual of Style specifically notes that “[c]ourts have long recognized [the] use of

shall to express obligations.”9 Id. at 58. In addition, § 3.77 further notes that because

obligations and intentions concern “future conduct,” and because there is no future tense in the

English language (similar to the present and past tenses), the terms “shall” and “will” have

“come to be used with future time.” Id. at 59. Likewise, § 3.78 states that both “shall” and

“will” are used “to mark future time.” Id. Finally, § 3.79 notes that although the word “shall” is

now used in a variety of other ways in common parlance, “in the stylized context of the language

of business contracts, … shall continues to serve as the principal means of expressing

obligations.” Id.

 With respect to the unique facts of this case, we believe that the foregoing provisions of

the Manual of Style represent how the words “shall be,” as used in ¶ 7 of the Settlement

9
 Furthermore, it is worth noting that § 3.72 expressly recommends that the word “shall” should not be used to
express anything other than language of obligation in a contract. Manual of Style at 57.

 17
Memorandum, are commonly understood in the context of a contract such as the Settlement

Memorandum. See First National Bank of Joplin v. Johnson, 431 S.W.2d 65 (Mo. banc 1968)

(holding that an insurance trust agreement which provided that the trustee “shall pay” to the

beneficiary the sum of $250.00 per month for as long as she lived and remained unmarried was

an unambiguous requirement of the agreement).

 Keller’s proposed interpretation of ¶ 7 is also entirely consistent with dictionary

definitions of the word “shall,” which indicate that this term expresses a mandatory duty or

command. For example, Black’s Law Dictionary defines “shall” as follows: “[h]as a duty to;

more broadly, is required to,” and further notes that, “[t]his is the mandatory sense that drafters

typically intend and that courts typically uphold.” Shall, Black’s Law Dictionary (11th ed. 2019)

(emphasis added). Although Black’s Law Dictionary covers several other senses in which the

word “shall” can be used (i.e., “should,” “may,” and “will”), the definition concludes by stating

that the mandatory sense is the only one that is acceptable “under strict standards of drafting.”

Id. See also Mind & Motion Utah Investments, LLC v. Celtic Bank Corp., 367 P.3d 994, 1002

n.36 (Utah 2016) (similarly noting that Black’s Law Dictionary recognizes that drafters typically

intend, and courts typically uphold, the mandatory sense of the word “shall”).

 Likewise, Webster’s Dictionary similarly notes that “shall” is “used to express a

command or exhortation.” Webster’s Third New International Dictionary (2003). See also U.S.

Cent. Underwriters Agency, Inc. v. Hutchins, 952 S.W.2d 723, 725 (Mo. App. E.D. 1997) (citing

Webster’s Third New International Dictionary (1976) for the proposition that, “[t]he definition

of ‘shall’ states that it is ‘used in laws, regulations, or directives to express what is mandatory”);

AAA Laundry & Linen Supply Co. v. Dir. of Revenue, 425 S.W.3d 126, 132 (Mo. banc 2014)

 18
(noting that Webster’s Third New International Dictionary is the “institutional dictionary of

choice” of Missouri courts).

 We also note that if the parties had intended any contrary meaning, they easily could have

worded ¶ 7 differently to clearly express that intent. For example, if the parties had intended for

all three of these requirements to occur on September 30, 2019 (as Respondents have argued),

they could have substituted the words “is hereby” (for “shall be”), as the words “is hereby” are

commonly understood to be “language of performance” and to reflect an immediate effect. See

Manual of Style at 51-52. Thus, ¶ 7 would read as follows: “Plaintiff’s stock is hereby

surrendered/sold, escrowed and pledged back to Plaintiff.” However, the parties did not adopt

this wording, which makes sense under the circumstances because even though the

surrender/sale of Keller’s “stock” by itself was a simple enough task, the parties most likely

realized that they needed additional time to hammer out the details of the escrowing and

pledging back of the “stock” after their marathon mediation session on September 30, 2019.

 Likewise, if the parties had intended for the “stock” to be surrendered/sold on September

30, 2019, but intended for the escrowing and pledging back to occur on some later date, they

easily could have used a combination of “is hereby” and “shall be” in ¶ 7, which would read as

follows: “Plaintiff’s stock is hereby surrendered/sold and shall be escrowed and pledged back to

Plaintiff.” However, the parties did not adopt this wording either, which also makes sense under

the circumstances because it is well understood that the whole point of Respondents escrowing

and pledging the “stock” back to Keller was to provide her with security for the $8.85 million in

installment payments that were due under ¶ 1 of the Settlement Memorandum between October

31, 2019, and April 1, 2023. Thus, it is virtually inconceivable that Keller, who was represented

by able counsel during the negotiation of the Settlement Memorandum, would have agreed to the

 19
immediate transfer of her “stock” (which the parties agreed was worth as much as $8.85 million,

subject to adjustments per ¶ 2 of the Settlement Memorandum), and then relied on Respondents’

good graces to subsequently execute the documents necessary to effect the escrowing and

pledging back of the “stock” without that valuable security firmly in hand.

 However, it is not necessary to know the subjective reasons the parties agreed to the

wording they adopted in ¶ 7 of the Settlement Memorandum because the bottom line is that their

adopted words of “shall be” clearly and unambiguously express an intent for this paragraph to

create a future obligation with respect to the three key requirements therein, which would occur

sometime after September 30, 2019.

 The parties’ use of the words “shall be” in ¶ 7 of the Settlement Memorandum, given the

broader context in which this paragraph operates within the entire agreement, clearly expressed a

future duty or requirement with respect to the surrendering/selling, escrowing, and pledging back

of Keller’s “stock” by using commonly understood “language of obligation.” There is no

reasonable interpretation of ¶ 7 where the words “shall be” could be understood to express an

intent for the immediate surrendering/selling, escrowing, and pledging back of Keller’s “stock,”

since these words are simply not understood to operate as “language of performance,” as

Respondents have incorrectly suggested.

 Our interpretation of ¶ 7 is reinforced by several other similar provisions of the

Settlement Memorandum that use the words “shall be” (or similar variants) to command

subsequent acts that could not be accomplished on September 30, 2019. For example, ¶ 9

provides as follows: “This lawsuit shall be dismissed without prejudice but Plaintiff shall

execute a covenant not to sue” (emphasis added). However, Respondents have not taken the

position that Keller is in breach of ¶ 9 for not immediately dismissing the lawsuit or not

 20
immediately executing a covenant not to sue. Indeed, such a position would be completely

untenable, as the parties fully understood that Keller would do these things sometime after

September 30, 2019. In fact, Keller did not dismiss her claims in the 2016 Lawsuit until January

10, 2020, which was a little over three months after the parties executed the Settlement

Memorandum. Furthermore, due to the impasse regarding the effective date of the “stock”

transfer, Keller still has not executed a covenant not to sue, which was included in the drafts of

the supplemental settlement documentation the parties exchanged in the months following

September 30, 2019. Regardless, Respondents have not claimed that Keller has breached ¶ 9, or

any other provision of the Settlement Memorandum that uses the phrase “shall be” or similar

words, simply because she did not immediately perform them on September 30, 2019, each of

which would have been a practical impossibility.

 Given the phrasing of ¶ 7, Respondents’ proposed interpretation would not only

effectively require us to conclude that the parties intended for Keller to surrender/sell her “stock”

to them on September 30, 2019, but also conclude that Respondents were not required to escrow

or pledge the “stock” back to Keller until some later date (i.e., when the parties subsequently

negotiated and executed appropriate documentation to that effect). Otherwise, Respondents

would arguably be in breach of the escrow and pledge back requirements because the parties do

not dispute that they still have not executed any documentation effecting these key requirements,

which provided Keller’s only security for the installment payments required under ¶ 1.

Accordingly, to avoid potential liability for breach of the escrow and pledge back requirements,

Respondents must accept that the surrender/sale of Keller’s “stock” was to occur concurrent with

their satisfaction of the important escrow and pledge back requirements, which the parties

understood would require additional time to negotiate and execute. Any other interpretation of ¶

 21
7 would require a tortured reading of the plain and unambiguous language the parties agreed to

and adopted.

 Having determined that the parties did not intend for the three items described in ¶ 7 to

take effect or occur on September 30, 2019, we must next address the question posed by

Respondents: if the transfer of Keller’s “stock” was not intended to occur on September 30,

2019, then when was it to occur? As noted, the Settlement Memorandum itself is silent as to any

specific timeframe for these requirements to occur. However, the parties have agreed that the

Settlement Memorandum contains all essential terms. We may therefore proceed to analyze the

final piece of this puzzle—when must the parties complete the requirements of ¶ 7?

 In answering Respondents’ question, Keller suggests that Missouri case law supplies the

answer: a “reasonable time.” Of course, determining when the three requirements of ¶ 7 must

occur is important because Respondents rely on this paragraph for their breach of contract claim,

which argues that Keller has refused to execute documents acknowledging that the transfer of her

“stock” was effective on September 30, 2019.10 Although not expressly stated in the Judgment,

in granting Respondents’ summary judgment motion with respect to the Enforcement Petition,

the circuit court presumably found that Keller’s refusal to execute Respondents’ proposed

settlement documents constituted a breach of this requirement. Regardless, because we have

determined that ¶ 7 does not express an intent that the surrender/sale of Keller’s “stock” occurred

on September 30, 2019, Keller cannot possibly be in breach of the Settlement Memorandum for

10
 Specifically, ¶ 40 of Respondents’ Enforcement Petition alleges as follows: “Despite all reasonable efforts by
Brown and Pelopidas, Keller refuses to execute a document required under the [Settlement Memorandum] which
acknowledges that Keller assigned all her right, title and interest in Pelopidas as of September 30, 2019.” In
addition, ¶ 41 contains the following similar allegations: “Despite all reasonable efforts by Brown and Pelopidas,
Keller refuses to execute a document which acknowledges the assignment of all Keller’s interests in Pelopidas
effective September 30, 2019.”

 22
refusing to execute documents reflecting an effective date of September 30, 2019, which

Respondents improperly insisted she do.

 We agree with Keller that because the Settlement Memorandum is silent on this issue, a

“reasonable time” is appropriate, as Missouri courts indeed recognize that “[w]hen a contract

does not specify a time period for performance, performance must be made within a reasonable

time.” Hemsath v. City of O’Fallon, 261 S.W.3d 1, 6 (Mo. App. E.D. 2008). “What constitutes

a reasonable time depends upon the circumstances of each case.” Id.

 In this case, we cannot (and need not) state what a “reasonable time” would be for the

parties to execute the supplemental documentation contemplated in the Settlement

Memorandum, as that would entail a highly fact intensive inquiry beyond the scope of the

summary judgment record. As discussed at length above, the reason the parties have so far failed

to execute the contemplated documents is the impasse regarding the effective date of the

surrender/sale of Keller’s “stock.” Although we ultimately conclude that Keller’s interpretation

of ¶ 7 is the correct one (and thus, she is not in breach), we need not address whether

Respondents’ refusal to execute documents in accordance with Keller’s position with respect to ¶

7 constitutes a breach of the Settlement Memorandum. This is because, as noted above, Keller’s

breach of contract claim does not assert a breach based on Respondents’ failure to execute the

supplemental documentation she proffered; rather, Keller’s breach of contract claim only relies

on Respondent’s failure to pay the accelerated installment payments required under ¶ 1. Thus,

that issue is not before this Court.

 For these reasons, the circuit court erred as a matter of law in determining that Keller

breached the Settlement Memorandum, which was the essential basis for each of Respondents’

claims in the Enforcement Petition. Accordingly, the entry of summary judgment in favor of

 23
Respondents with respect to each such claim is hereby reversed. Keller’s fourth point on appeal

is granted. For the same reasons, the circuit court erred as a matter of law in denying Keller’s

cross-motion for summary judgment with respect to each claim in the Enforcement Petition, and

thus, that decision is also hereby reversed. Furthermore, pursuant to Rule 84.14, summary

judgment is hereby entered in favor of Keller with respect to each claim in the Enforcement

Petition, which is hereby dismissed with prejudice. Keller’s fifth point on appeal is granted.

 Points I, II and III

 Keller’s first, second, and third points on appeal address the circuit court’s denial of her

motion for summary judgment with respect to her Counterclaim against Respondents, as well as

the circuit court’s sua sponte dismissal of the Counterclaim and the sua sponte granting of

summary judgment in favor of Respondents with respect thereto. However, because the circuit

court did not explain its basis for dismissing the Counterclaim, Keller has advanced two theories

of error with respect the circuit court’s possible basis for the dismissal: (1) failure to state a claim

upon which relief could be granted; or (2) summary judgment in favor of Respondents (even

though Respondents filed no such motion). Because we find that the circuit court erred in

determining that the surrender/sale of Keller’s “stock” occurred on September 30, 2019, we must

apply that finding to these three points on appeal since each of the circuit court’s rulings with

respect to Keller’s Counterclaim were likewise premised on this erroneous determination.

 In her first point on appeal, Keller argues that the circuit court erred as a matter of law in

sua sponte dismissing her Counterclaim for failure to state a claim upon which relief can be

granted because she pleaded the elements of a claim for breach of contract against Respondents.

Keller’s Counterclaim alleges that Respondents breached the Settlement Memorandum by not

paying the second installment of $1.1 million by April 1, 2020, as required by ¶ 1(b) of the

 24
Settlement Memorandum, and by not curing after being given notice, as permitted in ¶ 8. The

Counterclaim further alleges that upon Respondents’ failure to cure the second installment

payment, all outstanding installment payments under the Settlement Memorandum were

accelerated pursuant to ¶ 11, which totaled $8.6 million at the time; in addition, Keller seeks

accrued interest of one percent (1.0%) per month on all outstanding amounts pursuant to ¶ 6.

 Although the circuit court did not explicitly explain the rationale for its decision to

dismiss the Counterclaim sua sponte, it appears to be premised on its express finding that Keller

surrendered/sold her “stock” in Pelopidas effective September 30, 2019, as Respondents have

argued. In addition, the circuit court’s decision appears to be premised on a finding that Keller

committed a prior material breach of the Settlement Memorandum by failing and refusing to

execute the supplemental settlement documents proffered by Respondents, which reflected an

effective date of September 30, 2019. Thus, in light of these findings, the circuit court

presumably held that Respondents had not breached ¶ 1(b) by placing the $1.1 million payment

in escrow, and likewise, Respondents were not in breach for failing to pay the accelerated

amount of $8.6 million Keller seeks in the Counterclaim. Although the circuit court did not

explain its rationale for dismissing the Counterclaim, the foregoing appears to be the only logical

path for doing so (albeit ultimately an erroneous one).

 Regardless of the path traveled by the circuit court to arrive at its destination, we find that

it erred in dismissing Keller’s Counterclaim because, very simply, Keller has alleged the

elements of a claim for Respondents’ breach of the Settlement Memorandum, and Respondents’

performance was not excused by Keller’s purported prior material breach based on her failure

and refusal to execute the supplemental settlement documents that Respondents demanded,

which improperly reflected an effective date for the surrender/sale of Keller’s “stock” of

 25
September 30, 2019. This determination is based on our finding, discussed in connection with

Points IV and V above, that ¶ 7 did not contemplate an effective date of September 30, 2019, but

rather contemplated an effective date of when the parties subsequently executed the appropriate

supplemental settlement documentation, which needed to be done within a “reasonable time” of

the execution of the Settlement Memorandum. Accordingly, the circuit court’s sua sponte

dismissal of Keller’s Counterclaim is hereby reversed. Keller’s first point on appeal is granted.

 In her second point, Keller argues that the circuit court erred as a matter of law in sua

sponte granting summary judgment for Respondents with respect to her Counterclaim because it

did not have the authority to do so, as summary judgment is not available absent a proper motion

filed pursuant to Rule 74.04 or Rule 55.27(a)(6), and Respondents filed no such motion. In their

briefing, Respondents argued, inter alia, that the circuit court’s Judgment does not contain an

express holding that it entered summary judgment in favor of Respondents with respect to

Keller’s Counterclaim; rather, the Judgment simply states, in pertinent part, that the

“Counterclaim is dismissed with prejudice.” We initially agree with the general proposition,

posited by Keller, that in order for a circuit court to grant summary judgment for a party, “it must

normally have a motion for summary judgment before it and notice of a hearing must be made.”

Williams v. Mercantile Bank of St. Louis NA, 845 S.W.2d 78, 82 (Mo. App. E.D. 1993) (citing

Rules 55.26(a) and 44.01(d) and further noting that, in certain circumstances, a court may treat a

motion to dismiss as a motion for summary judgment). On the other hand, we also agree with

Respondents that the Judgment does not contain an express holding that the circuit court entered

summary judgment in their favor. However, we need not further address Keller’s second point

on appeal because our holdings with respect to Keller’s first and third points on appeal

effectively render it moot. Keller’s second point on appeal is therefore denied.

 26
 In her third point, Keller argues that the circuit court erred as matter of law in denying her

motion for summary judgment with respect to her Counterclaim because the summary judgment

record established that she was entitled to judgment as a matter of law and there was no genuine

dispute regarding the facts supporting her breach of contract claim against Respondents for

failing to pay the accelerated amount of $8.6 million.

 As a threshold matter, we initially note that an order denying a motion for summary

judgment is generally not a final judgment and cannot be reviewed on appeal. Stone v. Crown

Diversified Indus. Corp., 9 S.W.3d 659, 664 (Mo. App. E.D. 1999). However, the denial of a

motion for summary judgment may be reviewable “where the merits of that motion are

intertwined with the propriety of an appealable order granting summary judgment to another

party.” Id. In this case, because the merits of Keller’s motion for summary judgment with

respect to her Counterclaim are intertwined with the propriety of the circuit court’s order

granting summary judgment in favor of Respondents on the Counterclaim (which is an

appealable order), we may address the denial of Keller’s motion for summary judgment.

 Although the circuit court again did not fully explain the basis for its decision to deny

Keller’s motion for summary judgment with respect to her Counterclaim, we presume it was

premised on the circuit court’s erroneous finding that the surrender/sale of Keller’s “stock”

occurred on September 30, 2019. Regardless, because we find that ¶ 7 of the Settlement

Memorandum clearly expressed an intent for the surrender/sale of Keller’s “stock” to occur

within a reasonable period after September 30, 2019, we find that the circuit court not only erred

in denying Keller’s motion for summary judgment with respect to her Counterclaim, but also

erred in not entering summary judgment in her favor. Accordingly, we hereby reverse the circuit

court’s denial of Keller’s motion for summary judgment with respect to her Counterclaim and,

 27
pursuant to Rule 84.14, direct the circuit court to enter summary judgment in her favor and

against Respondents, jointly and severally, in the amount of $7.5 million, which is the amount of

installment payments then outstanding at the time of the breach ($8.6 million), less the $1.1

million held in escrow that was paid to Keller following the entry of the Judgment on November

30, 2020, plus interest of 1.0% per month on the outstanding $7.5 million through the date of

satisfaction, as well as interest of 1.0% per month on the $1.1 million while that amount was held

in escrow.11

 This holding, like those reversing the circuit court’s decisions regarding Respondents’

claims in the Enforcement Petition, is based on our core finding with respect to ¶ 7 of the

Settlement Memorandum, since Keller’s breach of contract claim hinged on whether

Respondents were justified in their undisputed failure and refusal to make the second installment

payment of $1.1 million by April 1, 2020 (and cure by April 7, 2020), on the basis of their

argument that Keller had previously committed a material breach of the Settlement

Memorandum. For all the reasons set forth above, we conclude that Keller has not previously

materially breached the Settlement Memorandum; therefore, the summary judgment record

establishes that Respondents—not Keller—breached the Settlement Memorandum. While we

recognize that Respondents most likely could not have asserted Keller’s purported prior material

breach as an affirmative defense because of the provisions of ¶ 11 (whereby Respondents waived

11
 We note that the parties have represented to this Court that Pelopidas is currently defunct (but it is not clear
exactly when this occurred). If true, pursuant to ¶ 2 of the Settlement Memorandum (which permits a reduction of
the installment payments required under ¶ 1 if Pelopidas’s revenue is less than $10 million in a given year),
Respondents would have been able to argue that any remaining installment payments should be reduced or
eliminated altogether. However, in their answer to Keller’s Counterclaim, Respondents did not assert any facts that
would have supported such an affirmative defense. Moreover, even if Respondents had timely asserted such an
affirmative defense, there is no evidence in the summary judgment record supporting Respondents’ entitlement to a
reduction pursuant to ¶ 2. Thus, Keller is entitled to the full amount of the accelerated payments due at the time of
Respondents’ default (i.e., April 1, 2020) and failure to cure (i.e., April 7, 2020), plus interest, notwithstanding any
subsequent events that may have otherwise entitled Respondents to a reduction pursuant to ¶ 2 if they had not
previously breached ¶ 1(b) by failing to make the second installment payment when due.

 28
all defenses to such a claim, except “accord and satisfaction” and “breach of the covenant not to

sue”), we need not decide whether ¶ 11 bars Respondents’ affirmative defense because we find

that this affirmative defense is not supported by the summary judgment record. Keller’s third

point on appeal is granted.

 Point VI

 Finally, Keller’s sixth point on appeal addresses the circuit court’s award of attorneys’

fees in favor of Respondents, which was premised on each of the aforementioned rulings in their

favor with respect to the claims in the Enforcement Petition and Keller’s Counterclaim. Because

we have reversed each of those rulings and find in favor of Keller, we find that she is now the

prevailing party for purposes of all claims asserted in this action. Accordingly, we hereby

reverse the award of attorneys’ fees in favor of Respondents and remand to the circuit court to

permit Keller to submit her request for attorneys’ fees, pursuant to ¶ 19 of the Settlement

Memorandum, and direct the circuit court to award Keller her reasonable attorneys’ fees in

connection with this action, which shall be entered against Respondents, jointly and severally.

 IV. Conclusion

 For the foregoing reasons, we find that the circuit court erred in (1) granting

Respondents’ motion for summary judgment with respect to the claims in the Enforcement

Petition; (2) denying Keller’s cross-motion for summary judgment with respect to Respondents’

claims against her in the Enforcement Petition; (3) denying Keller’s motion for summary

judgment with respect to her Counterclaim; (4) sua sponte dismissing Keller’s Counterclaim

with prejudice; and (5) not entering summary judgment in favor of Keller with respect to her

Counterclaim. Accordingly, each of those decisions are reversed, as set forth in our discussion

of Keller’s first through fifth points on appeal. In addition, pursuant to Rule 84.14, Keller’s

 29
motion for summary judgment with respect to her Counterclaim is granted, and the circuit court

is directed to enter judgment in Keller’s favor and against Respondents, jointly and severally, in

the amount of $7.5 million, plus appropriate interest, as set forth in our discussion of Keller’s

third point on appeal. Finally, the circuit court’s award of attorneys’ fees in favor of

Respondents is reversed and remanded to the circuit court for a determination and award of

reasonable attorneys’ fees in favor of Keller, which shall be entered against the Respondents,

jointly and severally, as set forth in our discussion of Keller’s sixth point on appeal.

 _______________________________
 Kelly C. Broniec, Judge

Colleen Dolan, P.J. and
Robert M. Clayton III, J. concur.

 30